**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff*,

and

SKOKOMISH INDIAN TRIBE,
*Petitioner-Appellant*,

v.

STATE OF WASHINGTON,
*Defendant-Real Party in Interest*,

JAMESTOWN S'KLALLAM TRIBE;
PORT GAMBLE S'KLALLAM
TRIBE; SQUAXIN ISLAND TRIBE,
*Respondents-Appellees*,

and

MUCKLESHOOT INDIAN TRIBE;
QUILEUTE INDIAN TRIBE; HOH
TRIBE; LUMMI TRIBE; QUINAULT
INDIAN NATION; NISQUALLY
INDIAN TRIBE; SUQUAMISH
INDIAN TRIBE; TULALIP TRIBES;
PUYALLUP TRIBE; UPPER SKAGIT
INDIAN TRIBE; SWINOMISH
INDIAN TRIBAL COMMUNITY,
*Real-Parties-in-Interest.*

No. 17-35760

D.C. Nos.
2:17-sp-01-RSM
2:70-cv-09213-RSM

OPINION

Appeal from the United States District Court
for the Western District of Washington
Ricardo S. Martinez, Chief Judge, Presiding

Argued and Submitted October 9, 2018
Seattle, Washington

Filed June 26, 2019

Before:  Richard A. Paez and Carlos T. Bea, Circuit Judges,
and C. Ashley Royal,[*] District Judge.

Opinion by Judge Bea;
Concurrence by Judge Bea;
Partial Concurrence and Partial Dissent by Judge Paez

## SUMMARY[**]

### Tribal Matters / Fishing Rights

The panel affirmed the district court's summary judgment in favor of respondents concerning the Skokomish Tribe's claim that it had "usual and accustomed" ("U&A") fishing rights in the Satsop River pursuant to *United States v. State of Washington*, 626 F. Supp. 1405 (1984), *aff'd*, 764 F.2d 670 (9th Cir. 1985) ("1984 Subproceeding").

---

[*] The Honorable C. Ashley Royal, United States District Judge for the Middle District of Georgia, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

In *United States v. Washington*, 384 F. Supp. 312 (W.D. Wash. 1974) ("Boldt Decision"), *aff'd and remanded*, 520 F.2d 676 (9th Cir. 1975), Judge Boldt issued a permanent injunction, which granted tribal fishing rights. It outlined the geography of the U&A locations of all the signatory tribes. The Boldt Decision set forth rules under which parties could invoke the court's continuing jurisdiction in future disputes.

The panel held that the Skokomish Tribe failed to abide by the Boldt Decision's pre-filing requirements, which mandate that parties attempt to resolve their disputes at a meet and confer before initiating a request for determination. In particular, the Skokomish Tribe failed to discuss the "basis for the relief sought" under Paragraph 25(b)(1)(A) and "whether earlier rulings of the court may have addressed or resolved the matter in issue" under Paragraph 25(b)(1)(F). The panel held that a failure to abide by the pre-filing requirements articulated in Paragraph 25(b) was a failure to invoke the jurisdiction of this court, and the panel lacked the ability to proceed to the merits.

The panel noted that if the Skokomish Tribe were to properly invoke the continuing jurisdiction of the Boldt Decision, their claims would be met with skepticism. The panel indicated that the Skokomish Tribe attempted an end-run around Judge Boldt's unambiguous determination of its U&A by arguing that the 1984 Subproceeding, dealing solely with primary fishing rights, somehow amended its U&A to include the Satsop River. The panel further noted that the 1984 Subproceeding had nothing to do with the boundaries of the Skokomish Tribe's U&A.

Judge Bea concurred, and indicated that this court should reevaluate whether Judge Boldt's injunction has met its

objectives, and whether the district court retains continuing jurisdiction.

Judge Paez concurred in part and agreed that the Skokomish Tribe's claim over the Satsop River was not supported by the 1984 Subproceeding's holding in *United States v. State of Washington*, 626 F. Supp. 1405 (W.D. Wash. 1984), *aff'd*, 764 F.2d 670 (9th Cir. 1985). Judge Paez dissented in part and disagreed with the majority's conclusion that the court could not reach the merits of the Skokomish Tribe's claim because of its failure to comply with the pre-filing requirements. Judge Paez would hold that the district court had jurisdiction, and deny the Skokomish Tribe's claims on the merits.

## COUNSEL

Earle David Lees (argued), Shelton, Washington, for Petitioner-Appellant.

David Babcock (argued), Kevin Lyon, and Sharon Haensly, Shelton, Washington, for Respondent-Appellee Squaxin Island Tribe.

Lauren Patricia Rasmussen (argued), Law Offices of Lauren P. Rasmussen, Seattle, Washington, for Respondents-Appellees Jamestown S'Klallam Tribe and Port Gamble S'Klallam Tribe.

Joseph V. Panesko, Senior Counsel; Robert W. Ferguson, Attorney General; Office of the Attorney General, Olympia, Washington; for Real Party in Interest State of Washington.

## OPINION

BEA, Circuit Judge:

We have called it an "ongoing saga," *Makah Indian Tribe v. Quileute Indian Tribe*, 873 F.3d 1157, 1160 (9th Cir. 2017); remarked that "[w]e cannot think of a more comprehensive and complex case than this," *Upper Skagit Indian Tribe v. Washington*, 590 F.3d 1020, 1022 (9th Cir. 2010) (citation omitted); and "puzzled" over why this "Jarndyce and Jarndyce" of an equitable decree "remains in force at all," *United States v. Washington*, 573 F.3d 701, 709 (9th Cir. 2009) (quoting Charles Dickens, *Bleak House* 3 (1853)). And yet, here we are. Forty-five years after Judge Boldt issued an injunction in *United States v. Washington*, 384 F. Supp. 312 (W.D. Wash. 1974) ("*Boldt Decision*"), *aff'd and remanded*, 520 F.2d 676 (9th Cir. 1975), it remains in effect. This case arises under it.

The Skokomish Tribe claim that it has "usual and accustomed" fishing rights in the Satsop River because of this court's decision in *United States v. State of Washington*, 626 F. Supp. 1405, 1487 (1984), *aff'd*, 764 F.2d 670 (9th Cir. 1985) ("*1984 Subproceeding*"). As it happens, that decision concerned which tribe had primary fishing rights within an already-recognized "usual and accustomed" (U&A) territory; it did not concern the boundaries of the Skokomish's usual and accustomed fishing rights at all.

The Squaxin Island Tribe, the Jamestown S'Klallam Tribe, the Port Gamble S'Klallam Tribe, and the state of Washington dispute the Skokomish's Satsop River claim. On cross-motions for summary judgment, the District Court for the Western District of Washington sided against the Skokomish and granted the respondents' motion for

summary judgment. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I.   Historical Background

Between 1854 and 1856, Isaac Stevens, then Governor of Washington Territory, executed eleven nearly identical treaties with Indian tribes in an area that would eventually become part of the state of Washington. *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 666 (1979). Under the Stevens Treaties, tribes ceded approximately sixty-four million acres of land to the United States. Vincent Mulier, *Recognizing the Full Scope of the Right to Take Fish Under the Stevens Treaties: The History of Fishing Rights Litigation in the Pacific Northwest*, 31 Am. Indian L. Rev. 41 (2007). As consideration for such cession, the tribes secured small reservations for themselves and the right to take fish "in common with" non-Native Americans at "usual and accustomed" off-reservation locations. *See, e.g.*, Treaty with the S'Klallam, 1855, 12 Stat. 933.

The Skokomish Tribe—along with the Jamestown S'Klallam, Lower Elwha, and Port Gamble S'Klallam tribes—signed the Treaty of Point No Point with Governor Stevens in 1855. *Id.*[1] The Skokomish Tribe is primarily

---

[1] The Treaty of Point No Point described the area reserved for the tribes as:

> Commencing at the mouth of the Okeho River, on the Straits of Fuca; thence southeastwardly along the westerly line of territory claimed by the Makah tribe of Indians to the summit of the Cascade Range; thence still southeastwardly and southerly along said summit to the head of the west branch of the Satsop River,

comprised of descendants of the Twana Tribe who, prior to treaty times, controlled the territory encompassed by the Hood Canal and its associated waterways. As with all of the Stevens Treaties, the Treaty of Point No Point stated that "[t]he right of taking fish at usual and accustomed grounds and stations is further secured to said Indians, in common with all citizens of the United States. . . ." *Id.*

Unfortunately, "[t]he rapid white settlement in the Pacific Northwest" after the signing of the Stevens Treaties immediately interfered with "Indian attempts to fish at off-reservation sites." Donald L. Parman, *Inconstant Advocacy: The Erosion of Indian Fishing Rights in the Pacific Northwest*, 53 Pacific Hist. Rev. 163, 166 (1984). In the century that followed, the state of Washington enacted legislation and enforced fishing regulations in a manner detrimental to the tribes' fishing rights. *See, e.g.*, Wash. Sess. Laws Ch. 247, Sec. 2 (1907); Init. Measure No. 77, State of Wash. Voting Pamphlet 5 (Nov. 6, 1934). As a result, the Indians' share of the overall catch in off-reservation sites plummeted. By 1958, for instance, Indian fishing accounted for 6% of the total salmon catch in the Puget Sound, while sports fishing accounted for 8.5% and commercial fishing accounted for 85.5%. *United States v. Washington*, 853 F.3d 946, 957 (9th Cir. 2017).

Tensions between the tribes and the state of Washington intensified in the 1960s. Emboldened by the civil rights movement, more than fifty tribes organized a series of "fish-

down that branch to the main fork; thence eastwardly and following the line of lands heretofore ceded to the United States by the Nisqually and other tribes and bands of Indians, to the summit of the Black Hills, and northeastwardly to the portage known as Wilkes' Portage . . . .

ins" in 1964. Bradley G. Shreve, *From Time Immemorial: The Fish-In Movement and the Rise of Intertribal Activism*, 78 Pacific Hist. Rev. 403, 415 (2009). The "fish-ins"— which made national news when the actor Marlon Brando was arrested for fishing with a drift net in the Puyallup River—were accompanied by a march on the state capital and a series of protests. Hunter S. Thompson, *Marlon Brando and the Indian Fish-In*, National Observer, March 9, 1964. The tribes sought to enforce the Stevens Treaties guarantee of their "right of taking fish" in their "usually and accustomed grounds."[2] The state of Washington argued that its fishing regulations were a proper exercise of its police power.

The federal government filed suit on behalf of the tribes in 1970, and the ensuing litigation culminated in the Boldt Decision. Issued after nearly four years of litigation, the Boldt Decision held that the language "in common with" granted the tribes fifty percent of the harvestable number of fish in their "usual and accustomed" fishing grounds. *Boldt Decision*, 343.[3] It defined "usual and accustomed" as "every fishing location where members of a tribe customarily fished from time to time at and before treaty times . . . ." *Id.* at 332. Then, relying on considerable historical and anthropological evidence, it outlined the geography of the usual and

---

[2] As one Indian leader said, "[W]e already have the law on our side in the form of treaties[;] all we ask the white man to do is live up to those treaties." *Id.*

[3] This portion of the decision was later upheld by the Supreme Court in *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 686, *modified sub nom. Washington v. United States,* 444 U.S. 816 (1979).

accustomed (U&A) locations of all the signatory tribes. *Id.* at 332–33.

The U&A of the Skokomish Tribe was announced in six paragraphs of the Boldt Decision that detailed the lineage, history, and customs of the tribe. *Id.* at 376–77. The court described the geographic boundaries of the Skokomish U&A as follows:

> "The usual and accustomed fishing places of the Skokomish Indians before, during and after treaty times included all the waterways draining into Hood Canal and the Canal itself."

*Id.* at 377. The Skokomish admit there was no ambiguity in Judge Boldt's determination.

Relevant here, Judge Boldt also issued a permanent injunction, articulating rules under which parties could invoke the court's continuing jurisdiction in future disputes. *Id.* at 419. Under Paragraph 25(a), later modified by an August 23, 1993 Order (Case No. 70-9213, Dkt. # 13599), parties are authorized to invoke the continuing jurisdiction of the court to determine:

> (1) Whether or not the actions intended or effected by any party (including the party seeking a determination) are in conformity with [the Boldt Decision];
>
> (2) Whether a proposed state regulation is reasonable and necessary for conservation;
>
> (3) Whether a tribe is entitled to exercise powers of self-regulation;

(4) Disputes concerning the subject matter of this case which the parties have been unable to resolve among themselves;

(5) Claims to returns of seized or damaged fishing gear or its value, as provided for in this injunction;

(6) The location of any of a tribe's usual and accustomed fishing grounds not specifically determined by [the Boldt Decision]; and

(7) Such other matters as the court may deem appropriate.

*Id.* at 1–2. The Boldt Decision also lays out mandatory pre-filing requirements before initiating a subproceeding:

b) To invoke this court's continuing jurisdiction, the party seeking relief shall initiate a subproceeding in this action by filing a request for determination. Subproceedings will be conducted in accordance with the following procedures:

(1) Before a request for determination is filed (except for an emergency matter, addressed below), the party seeking relief ("requesting party") shall meet and confer with all parties that may be directly affected by the request ("affected party") and attempt to negotiate a settlement of the matter in issue.

> . . . In addition to other matters the
> parties may wish to address, the
> parties shall discuss at the meeting
> (A) the basis for the relief sought by
> the requesting party; . . . (F) whether
> earlier rulings of the court may have
> addressed or resolved the matter in
> issue in whole or in part[.]

*Id.* at 3–4. In other words, before filing a request for
determination (RFD) under the Boldt Decision, the party
seeking to invoke the court's continuing jurisdiction must
first disclose the "basis for [their] relief" in a "meet and
confer" with all affected parties. *Id.*

## II. Procedural History

### a. 1984 Subproceeding

On June 17, 1981, the Skokomish filed an RFD to
establish that its "fishing rights in [the] Hood Canal are
primary to the rights of any other tribe." It argued that it had
primary rights to the Hood Canal at the time the Treaty of
Point No Point was signed, and that historically, other tribes
fished near the Hood Canal subject to Skokomish approval.
Its RFD was opposed by the Port Gamble Klallam Band, the
Makah Tribe, the Tulalip Tribe, and the Suquamish Tribe.[4]

---

[4] On March 8, 1983, the court approved a settlement agreement
between the Skokomish and the Port Gamble Band of Klallam, Lower
Elwha Band of Klallam, and Jamestown Band of Klallam. *United States
v. State of Wash.*, 626 F. Supp. 1405, 1468–69 (W.D. Wash. 1983). This
agreement (the "Hood Canal Agreement") recognized the Skokomish's
primary rights to the Hood Canal, but allowed the other signatories to

The district court referred the RFD to a special master. The district court's first order mistakenly ordered the special master to determine the boundaries of the Skokomish U&A, but that order was amended by the court. The amended order ("Amended Order") clarified that "the request of the tribe was for determination of the primary right of [the] Skokomish Indian Tribe in Hood Canal Fishery." In other words, the 1984 Subproceeding determined only which tribe had primary rights in the Hood Canal; it did not disturb the boundaries of Judge Boldt's prior U&A determination.

The special master submitted a report and recommendation with findings of fact, which the district court adopted in full. *1984 Subproceeding*, 1487 n.63. The findings of fact were primarily based on: 1) information collected by Dr. Elmendorf between 1935 and 1955, "widely regarded to be the best ethnography of a case-area tribe"; 2) the work of Dr. T.T. Waterman, an anthropologist who compiled an "extensive list and map of sites used by Indians" around 1920; and 3) the journal of George Gibbs, a lawyer, ethnographer, and secretary to the 1855 Treaty Commission. *Id.* at 1487–91. The district court adopted ten findings of fact in total. *Id.*

Finding of fact #353 excerpted a passage from the 1854–55 journal of George Gibbs ("Gibbs Journal"). *Id.* at 1489. In this entry, Gibbs described Skokomish territory as:

> extend[ing] from Wilkes' Portage northwest across to the arm of Hood Canal up to the old limits of the Tchimakum, thence westerly to the summit of the Coast Range, thence

---

use the canal under certain conditions. *Id.* at 1468. The Suquamish did not sign the agreement and continued to oppose the RFD in district court.

> southerly *to the head of the west branch of the Satsop*, down that branch to the main fork, thence east to the summit of the Black Hills, thence north and east to the place of beginning.

*Id.* (emphasis added). The court found this "to be the best available evidence of the treaty-time location of Twana [Skokomish] territory." *Id.*

The court found that taken together, evidence from Elmendorf, Waterman, and the Gibbs Journal supported its conclusion that the Skokomish held primary fishing rights within its U&A. *Id.* at 1491. When describing the geographic borders of the territory, the court continually and exclusively referred to finding of fact #354, which stated:

> The court agrees, and upon consideration of all the relevant evidence in this matter, finds that the treaty-time territory of the Twana Indians encompassed all of the waters of Hood Canal, the rivers and streams draining into it, and the Hood Canal drainage basin south of a line extending from Termination Point on the west shore of Hood Canal directly to the east shore. . . .

*Id.* at 1489–90.

That geographic description contained no reference to the Satsop River.

### b. Current Subproceeding

On November 4, 2015, the Skokomish invited all "directly affected" parties to a meet and confer at the Lucky

Dog Casino in Skokomish, Washington. The invitation acknowledged that Judge Boldt had previously determined that the Skokomish U&A included the Hood Canal and said nothing about the 1984 Subproceeding. The invitation announced the intent of the Skokomish to invoke the court's jurisdiction under ¶ 25(a)(6) and ¶ 25(a)(7) to (1) determine that the Skokomish U&A "also includes the entire Satsop Fishery, which was not specifically determined by [the Boldt Decision];" and (2) determine that the Skokomish "holds the primary right to take fish on the entire Satsop Fishery."

At the meet and confer, the Skokomish presented a report entitled "Some Anthropological Observations on Data [P]ertaining to the Relationship Between the Satsop and the Skokomish Indian Tribes" ("Thompson Report"). No settlement was reached, and the parties were unable to resolve their differences through mediation.

On March 9, 2017, the Skokomish distributed a memorandum to the other tribes indicating its intent to begin fishing in the Satsop River. The memorandum referred to the 1984 Decision as the "legal basis" of its position that the Satsop River was "within Skokomish (or Twana) Territory." According to the other tribes, this was the first time the Skokomish referenced the 1984 Subproceeding as the basis of its claim, having referenced only the Thompson Report at the meet and confer.

On April 28, 2017, the Skokomish filed an RFD in district court. Its filing stated that it had satisfied all pre-filing requirements, and asserted that the district court had jurisdiction "pursuant to Paragraphs 25(a)(1)–25(a)(7)" of the Boldt Decision. It asked the court to "confirm[]" its primary right to take fish within the "Satsop River and its tributary forks." According to the Skokomish, the 1984 Subproceeding had awarded it the primary right to fish in the

Satsop River because it had "fully adopt[ed]" the Gibbs Journal, which made reference to the Satsop. The Hood Canal, therefore, was "just one small part of the whole."

The Squaxin Island Tribe, the Jamestown S'Klallam Tribe, the Port Gamble S'Klallam Tribe, and the state of Washington opposed the Skokomish. Both sides moved for summary judgment. The respondents argued that 1) the Skokomish failed to follow the pre-filing requirements under ¶ 25(b); 2) the Skokomish RFD was procedurally improper because it failed to establish jurisdiction under ¶ 25(a); 3) the RFD was invalid because it violated the Hood Canal Agreement; and 4) the court had "previously determined, unambiguously, that the Skokomish U&A is the Hood Canal and its drainage basin, and therefore it is not entitled to any ruling that it has primary fishing rights outside of that established U&A."

The District Court granted the respondents motion for summary judgment and denied the Skokomish's motion for summary judgment. First, the court held that the Skokomish had failed to comply with the pre-filing requirements in ¶ 25(b). The court observed that the RFD was "clearly different than what was actually discussed at the meet and confer," defeating "the purpose of any meaningful attempt to resolve the issue" out of court. *See infra*, 17–19.

Next, the court considered whether the Skokomish had failed to invoke the jurisdiction of the court under ¶ 25(a). The court found that it had "fail[ed] to do so" by "mak[ing] no effort to identify which" subparagraph provided jurisdiction. For the sake of argument, however, the court assumed that the Skokomish had asserted either ¶ 25(a)(1)—whether the actions of either party are "in conformity with the Boldt Decision"—or ¶ 25(a)(6)—the "location of any

tribe's U&A not specifically determined in the Boldt Decision."

As to the Skokomish's substantive claims, the court did not agree that the 1984 Subproceeding had granted the Skokomish U&A rights to the Satsop River.[5] According to the court, this claim was based on a "blatant[] misrepresent[ation] [of] the record in the 1984 [S]ubproceeding." As the Amended Order said, the Skokomish had sought only a "determination of [its] primary right . . . in Hood Canal Fishery," not an expansion of its U&A. In other words, the 1984 Decision could not have awarded the Skokomish U&A rights in the Satsop River because that "subproceeding simply did not adjudicate the scope of [the] Skokomish U&A."

III.    Discussion

We review the district court's grant of summary judgment de novo. *Bagdadi v. Nazar,* 84 F.3d 1194, 1197 (9th Cir. 1996). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether genuine issues of material fact exist and whether the district court correctly applied the relevant substantive law. *Goodman v. Staples the Office Superstore, LLC*, 644 F.3d 817, 822 (9th Cir. 2011).

---

[5] The district court found that the Skokomish's failure on the merits was itself a failure to invoke the court's jurisdiction under ¶ 25(a).

### a.  Paragraph 25(a) of the Boldt Decision

The Boldt Decision requires parties to invoke the court's continuing jurisdiction under the subsections listed in ¶ 25(a). The Skokomish failed to do so.

After suggesting that it sought to invoke the court's jurisdiction subject to ¶ 25(a)(6) and ¶ 25(a)(7) at the meet and confer, the Skokomish's RFD asserted jurisdiction pursuant to every subsection in ¶ 25(a): "¶ 25(a)(1)—25(a)(7)". In its brief to the district court, the Skokomish defended its lack of specificity by arguing that the parties could not agree "on the applicability of any one subsection." Now, it claims that it needs "flexibility to respond to attacks being brought by multiple parties on differing grounds."

The potential defenses raised by the respondents, however, have no bearing on the Skokomish's required jurisdictional statement. As the district court pointed out, "[i]t is Skokomish's burden, as the filing party, to identify the basis for jurisdiction." *See also McNutt v. Gen. Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 182 (1936) ("It is incumbent upon the plaintiff properly to allege the jurisdictional facts"). The Skokomish's jurisdictional statement was equivalent to a plaintiff asserting federal jurisdiction by claiming that *either* diversity jurisdiction, subject matter jurisdiction, or supplemental jurisdiction has been met. Such general, catch-all statements are not enough; some degree of further specificity is required.

### b.  The Boldt Decision's Pre-Filing Requirements

The Boldt Decision mandates that parties must attempt to resolve their disputes with opposing parties at a meet and confer before initiating an RFD. In particular, parties are required to discuss "the basis for the relief sought" under

¶ 25(b)(1)(A), and "whether earlier rulings of the court may have addressed or resolved the matter in issue" under ¶ 25(b)(1)(F). The Skokomish did not abide by this provision.

The problem is this: the Skokomish's claim before this court—that the 1984 Subproceeding recognized its U&A rights in the Satsop River because it referenced the Gibbs Journal—was never disclosed at the meet and confer meeting at the Lucky Dog Casino. Instead, the invitation to the meet and confer stated that the U&A in the Satsop Fishery "was not specifically determined by [the Boldt Decision]," an admission that the Skokomish's claim had not been recognized previously, and an admission directly contrary to the Skokomish's purported claims under ¶ 25(a)(1). In fact, the invitation never mentioned the 1984 Subproceeding or the Gibbs Journal at all; nor did it reference ¶ 26(a)(1), which provides jurisdiction to disputes over previously adjudicated matters. No reference to the 1984 Subproceeding appears in the record until the Skokomish's memorandum on March 9, 2017, sent immediately before the Skokomish filed its RFD. Only then did the parties learn of the claim the Skokomish raise here.

The Skokomish counter by pointing out that they discussed the Thompson Report at the meet and confer, which no party disputes. But while the Thompson Report contains a buried reference to the Gibbs Journal, it falls well short of articulating the basis of the Skokomish's current claim. If anything, the information presented at the meet and confer suggested that the Skokomish planned to argue that the historical evidence in the Thompson Report supported the establishment of a new U&A. Now, the Skokomish argue the opposite: that its rights had already been recognized in the 1984 Subproceeding.

Moreover, the Skokomish were also bound by ¶ 25(b)(1)(F), which required it to disclose whether its claim rested on "earlier rulings of the court [that] may have addressed or resolved the matter." To rely entirely on an "earlier ruling of the court" without having discussed it at the meet and confer meeting is a plain violation of the Boldt Decision's pre-filing requirements. The district court was correct to so conclude.

### c. *U&A in the Satsop River, and the Continuing Jurisdiction of the Boldt Decision.*

A failure to abide by the pre-filing requirements articulated in ¶ 25(b) is a failure to invoke the jurisdiction of this court. Thus, while it would be more efficient for us to do so, we lack the ability to proceed to the merits.[6] Should the Skokomish (properly) invoke the continuing jurisdiction of

---

[6] To be sure, as the partial concurrence points out, the Boldt Decision's pre-filing requirements are court-created rules, not jurisdictional barriers. *See Hamer v. Neighborhood Hous. Servs. of Chicago*, 138 S. Ct. 13, 20 (2017). But that makes no difference here. Since *Muckleshoot Tribe v. Lummi Indian Tribe*, 141 F.3d 1355 (9th Cir. 1998) (*Muckleshoot I*) was decided, the Supreme Court has clarified that even non-jurisdictional requirements "assure relief to [the] party properly raising them." *Eberhart v. United States*, 546 U.S. 12, 19 (2005). Several parties properly objected in this case, and only one (arguably) waived its objection at oral argument. Therefore, we may not reach the merits.

Furthermore, the district court reached the Skokomish's substantive claims by labeling them as "jurisdictional"—a semantic difference, perhaps, but a semantic difference with which we disagree. Thus, if we were to reach those claims, we would have to *sua sponte* overlook the pre-filing deficiencies, rebrand the district court's "jurisdictional" holding as a ruling on the merits, and then affirm that judgment, too. Judicial efficiency is an admirable goal, but that is a bit too much maneuvering to reach the merits.

the Boldt Decision and file this suit again, however, we note our deep skepticism of its claims.

At bottom, the Skokomish attempt an end-run around Judge Boldt's unambiguous determination of its U&A by arguing that the 1984 Subproceeding, dealing solely with primary fishing rights, somehow amended its U&A to include the Satsop River. Nothing could be further from the truth. The 1984 Subproceeding had nothing to do with the boundaries of the Skokomish's U&A. *Amended Order*, *see supra* 12. It had to do exclusively with the Skokomish's primary rights in the Hood Canal, already recognized as within the U&A of the Skokomish. And even if it did, the 1984 Subproceeding's holding made no mention of the Satsop River:

> The court agrees, and upon consideration of all the relevant evidence in this matter, finds that the treaty-time territory of the Twana Indians encompassed all of the waters of Hood Canal, the rivers and streams draining into it, and the Hood Canal drainage basin south of a line extending from Termination Point on the west shore of Hood Canal directly to the east shore. . . .

*1984 Subproceeding*, 1489–90. Turning the Gibbs Journal's passing reference to the Satsop River into the "express[] determination" of this court—as the Skokomish ask us to do—is several bridges too far. We doubt a future court would conclude otherwise.

**AFFIRMED**.

BEA, Circuit Judge, concurring:

In the proceedings below, the district court opined that "[b]ringing disputes such as the instant one . . . bolsters the idea that perhaps the sun has set on Judge Boldt's injunction and this Court's continuing jurisdiction." Our colleagues on this circuit have expressed that sentiment before, *Washington*, 573 F.3d at 709, and I echo it here.

"If a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper." *Horne v. Flores*, 557 U.S. 433, 450 (2009). Judge Boldt found a permanent injunction necessary to protect "the anadromous fish resource, the rights of the Indian tribes," and to ensure "the lawful exercise of state police power." *Boldt Decision*, 413.

[1] Forty-five years later, there is ample reason to believe that these goals have been achieved. Off-reservation fishing is effectively managed, Wash. Dep't of Fish & Wildlife, *2018–19 Co-Managers' List of Agreed Fisheries*, https://wdfw.wa.gov/sites/default/files/2019-03/2018-19agreement.pdf (Apr. 13, 2018), enforcement of treaty rights is no longer an issue, and the Washington Supreme Court is no longer an unfriendly place for tribal litigants, *Washington State Dep't of Licensing v. Cougar Den, Inc.*, 139 S. Ct. 1000 (2019). So, then, why are we here?

Elsewhere, tribes adjudicate their fishing rights in state and federal court without special jurisdictional or pre-filing requirements. *See, e.g.*, *State v. Tinno*, 497 P.2d 1386 (Idaho

---

[1] Anadromous fish are fish who "ascend[] rivers from the sea at certain seasons for breeding," such as salmon. *Anadromous*, Merriam-Webster's Dictionary (3rd ed. 1961).

1972); *State v. Watters, Jr.*, 156 P.3d 145 (Or. 2007). Those adjudications, moreover, involve straightforward interpretations of treaty language rather than an inquiry into "what Judge Boldt meant in precise geographic terms by his use of [certain] phrase[s]." *Muckleshoot I*, 141 F.3d at 1359. I do not doubt that litigation would continue in the absence of the Boldt Decision's continuing jurisdiction. But such litigation would at least treat the tribes for what they are: "separate sovereigns" who have signed treaties with the United States, *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978), and who can vindicate their rights without an "extraordinary" judicial decree, *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 500 (1941).

Of course, we need not decide whether Judge Boldt's decree should be altered because no party has asked us to. Here, we merely affirm the district court's summary judgment order on the ground that the Skokomish failed to comply with the Boldt Decision's pre-filing jurisdictional requirements. But we should reevaluate Judge Boldt's equitable decree soon. The "ultimate objective" of the Boldt Decision was to "finally settle . . . as many as possible of the divisive problems of treaty right fishing" that pitted "state, commercial and sport fishing officials and non-Indian fishermen on one side and tribal representatives and members on the other side." *Boldt Decision*, 329–30. At some point, this court should consider whether that objective has been met.

PAEZ, Circuit Judge, concurring in part and dissenting in part:

I agree with my colleagues that the Skokomish's claim over the Satsop River is not supported by the 1984 Subproceeding's holding in *United States v. State of Wash.*, 626 F. Supp. 1405 (W.D. Wash. 1984), *aff'd*, 764 F.2d 670 (9th Cir. 1985). I disagree, however, with the majority's conclusion that we may not reach the merits of the Skokomish's claim because of its failure to comply with the pre-filing requirements.

The majority concedes that the Boldt Decision's pre-filing requirements are not jurisdictional barriers per se, but attempts to recast them as mandatory claim-processing rules that preclude our review. In doing so, the majority overlooks the fact that mandatory claim-processing rules "may be waived or forfeited." *Hamer v. Neighborhood Hous. Servs. of Chicago*, 138 S. Ct. 13, 17 (2017). Defendants did precisely that. *See* Oral argument at 27:53–28:35, *United States v. Jamestown S'Klallam Tribe*, No. 17-35760 (9th Cir. Oct. 9, 2018), https://www.ca9.uscourts.gov/media/view_vi deo.php?pk_vid=0000014318. It is in fact the majority's opinion that involves quite a lot of maneuvering, asserting it has jurisdiction but may not reach the merits, and yet still commenting on the merits of the Skokomish's claim. I would clearly hold that the district court had jurisdiction and deny the Skokomish's claim on the merits.

Jurisdiction is "the courts' statutory or constitutional *power* to adjudicate the case." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 89 (1998); *see also Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006). As the majority describes at length, the Boldt Decision was the result of lengthy and complex litigation over the fishing rights of tribes in the state of Washington. *United States v.*

*Washington*, 384 F. Supp. 312 (W.D. Wash. 1974), *aff'd*, 520 F.2d 676 (9th Cir. 1975) ("Boldt Decision"). The district court had jurisdiction over the original proceeding under 28 U.S.C. §§ 1345 (cases involving the United States as a party), 1331 (cases with a federal question), 1343 (cases involving civil rights), and 1362 (cases brought by any Indian tribe). *Id.* at 328. At least one of these provisions would provide for district court jurisdiction over—in other words, power to hear—the Skokomish's claim if filed as an entirely new action and not a subproceeding under the Boldt Decision.

The majority rejects the Skokomish's attempt to invoke the court's continuing jurisdiction under Paragraph 25 of the Boldt Decision, *id.* at 419, based on its failure to comply with pre-filing requirements. This holding, however, overlooks the fact that the district court nevertheless did exercise its continuing jurisdiction over the Skokomish's claim and denied it on the merits. Compliance with the Boldt Decision's Paragraph 25 procedural prerequisites are obligatory, but they are not a "jurisdictional" restriction on the district court's constitutional and statutory power to adjudicate the claim.

In fact, this would not be the first time that the district court waived strict compliance with Paragraph 25 pre-filing procedures. In *Muckleshoot Tribe v. Lummi Indian Tribe*, one of the tribal parties argued that the district court erred in entertaining a summary judgment motion because the moving tribe failed to initiate a separate subproceeding as provided in Paragraph 25. 141 F.3d 1355, 1357 (9th Cir. 1998). The district court agreed that the Muckleshoot failed to follow the pre-filing procedures under Paragraph 25, but nevertheless waived the technical compliance with Paragraph 25 since both tribes had notice of the issues for

several years. *Id*. at 1358. On appeal, we affirmed the district court's decision. *Id*. Critically, we described the district court's decision as one "regarding the management of litigation," which is reviewed for abuse of discretion. *Id*. (citing *O'Neill v. United States*, 50 F.3d 677, 687 (9th Cir. 1995)). We found "no abuse of discretion in the district court's decision to entertain [the] Muckleshoot's motion without requiring initiation of a new, separate subproceeding *with all the attendant cost and delay*." *Id*. (emphasis added).

Similarly, the district court's resolution of the Skokomish's claim involved management of the litigation. The court could have dismissed the Skokomish's petition for failure to follow Paragraph 25 pre-filing procedures. Yet, the court—sensibly—decided to move onto the merits to conserve time and resources, and dispose of the Skokomish's claim rather than forcing the parties to repeat the pre-filing process. "Wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation, does not counsel rigid mechanical solution of such problems." *O'Neill*, 50 F.3d at 687 (citing *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183–84 (1952)); *see also Arbaugh*, 546 U.S. at 515. Under the majority's approach, the district court and the parties would now be forced to undergo duplicative litigation. In the interest of judicial economy and giving due deference to the district court's decision to rule on the merits, I would hold that the district court did not abuse its discretion in exercising jurisdiction over the Skokomish's claim and affirm its summary judgment ruling.

Lastly, I cannot join Judge Bea's separate concurrence because he provides no substantive basis in the record or elsewhere for his suggestion that the ultimate objective of the Boldt Decision has been met. Moreover, these

comments exceed the scope of our review. To my knowledge, no party has requested the district court to modify or terminate its continuing jurisdiction. We should refrain from commenting on the relevance of and necessity for Judge Boldt's decree until that issue has been fully vetted in the district court and is properly before us.