**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SWINOMISH INDIAN TRIBAL COMMUNITY; TULALIP TRIBES; UPPER SKAGIT INDIAN TRIBE, | No. 21-35812 |
| | D.C. No. 2:19-sp-00001-RSM |
| *Petitioners-Appellees*, | |
| v. | |
| LUMMI NATION, | ORDER AND AMENDED OPINION |
| *Respondent-Appellant*, | |
| STILLAGUAMISH TRIBE OF INDIANS; HOH INDIAN TRIBE; SUQUAMISH INDIAN TRIBE; STATE OF WASHINGTON; JAMESTOWN S'KLALLAM TRIBE; PORT GAMBLE S'KLALLAM TRIBE; SKOKOMISH INDIAN TRIBE; LOWER ELWHA KLALLAM TRIBE; PUYALLUP TRIBE OF INDIANS, | |
| *Real Parties in Interest*. | |

| | |
|---|---|
| SWINOMISH INDIAN TRIBAL COMMUNITY; TULALIP TRIBES; | No. 21-35874 |

UPPER SKAGIT INDIAN TRIBE,

 *Petitioners-Appellees*,

 v.

LUMMI NATION,

 *Respondent*,

 and

JAMESTOWN S'KLALLAM TRIBE;
PORT GAMBLE S'KLALLAM
TRIBE,

 *Real-Party-in-Interest-
 Appellants*,

STILLAGUAMISH TRIBE OF
INDIANS; HOH INDIAN TRIBE;
SUQUAMISH INDIAN TRIBE;
STATE OF WASHINGTON;
SKOKOMISH INDIAN TRIBE;
LOWER ELWHA KLALLAM
TRIBE; PUYALLUP TRIBE OF
INDIANS,

 *Real Parties in Interest*.

D.C. No. 2:19-sp-
00001-RSM

Appeal from the United States District Court
for the Western District of Washington
Ricardo S. Martinez, District Judge, Presiding

Argued and Submitted November 9, 2022
Seattle, Washington

Filed September 11, 2023
Amended October 3, 2023

Before:  Sandra S. Ikuta and Daniel P. Collins, Circuit Judges, and Sidney A. Fitzwater,[*] District Judge.

Order;
Opinion by Judge Collins

---

## SUMMARY[**]

### Tribal Fishing Rights

The panel affirmed the district court's grant of summary judgment to the Swinomish Indian Tribal Community, Tulalip Tribes, and Upper Skagit Indian Tribe; dismissed as moot a cross-appeal filed by the Jamestown S'Klallam Tribe and Port Gamble S'Klallam Tribe (collectively, "S'Klallam") from the district court's grant of summary judgment; and dismissed as moot S'Klallam's appeal of the district court's denial of the S'Klallam's motion for reconsideration, in a long-running case regarding Indian fishing rights in certain waters in Washington state.

---

[*] The Honorable Sidney A. Fitzwater, United States District Judge for the Northern District of Texas, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The current dispute concerns the usual and accustomed fishing places in which the Lummi Nation ("the Lummi") have fishing rights under a 1974 decree, issued by District Judge Boldt, over the waters east of Whidbey Island in Puget Sound.

In interpreting Judge Boldt's decree, the panel followed the two-step inquiry recently described in *Upper Skagit Indian Tribe v. Sauk-Suiattle Indian Tribe*, 66 F.4th 766, 770-71 (9th Cir. 2023).  At step one, a court uses the standard tools for interpreting precedent, starting with the text of the applicable Finding of Fact, as well as the record evidence before Judge Boldt and other evidence raised by the moving party that sheds light on Judge Boldt's understanding of the geography at the time.  At step two, a court determines whether the moving party has carried the burden of showing that there was no record evidence that favors the non-moving party's contrary interpretation of the Finding of Fact in a way that would undermine the moving party's theory of Judge Boldt's intent.

Applying the two-step inquiry, the panel concluded that the district court correctly held that the Swinomish, Tulalip, and Upper Skagit carried their burden to warrant a ruling, under Paragraph 25(a)(1) of the 1974 Decree, that Judge Boldt's "determination of Lummi's usual and accustomed fishing grounds and stations" did not extend to the disputed waters at issue here.

At step one, the panel held that it was fundamentally ambiguous whether Judge Boldt and the parties in 1974 would have understood the marine areas of Northern Puget Sound from the Fraser River south to the present environs of Bellingham Bay, to include any waters east of Whidbey Island.  At step two, the panel held that the Swinomish,

Tulalip, and Upper Skagit met their burden to show that there was no evidence in the record before Judge Boldt of historical Lummi fishing in the disputed waters beyond what would be merely incidental or occasional. The panel declined to read the decree to grant the Lummi fishing rights east of Whidbey Island.

The S'Klallam filed a cross-appeal to object certain statements in the district court's summary judgment order concerning fishing rights in waters west of Whidbey Island, where the S'Klallam claim fishing rights. The panel held that it had already clarified matters in the S'Klallam's favor in the ordinary course of disposing of the Lummi's appeal, and therefore the S'Klallam's cross-appeal was moot.

---

## COUNSEL

James R. Sigel (argued), James M. Schurz, Mark D. McPherson, and Camille Framroze; Morrison & Foerster LLP, San Francisco, California; Deanne E. Maynard, Morrison & Foerster LLP, Washington, D.C.; for Respondent-Appellant Lummi Nation.

Emily H. Haley (argued) and James M. Jannetta, Office of the Tribal Attorney, Swinomish Indian Tribal Community, La Conner, Washington; for Petitioner-Appellee Swinomish Indian Tribal Community.

David S. Hawkins (argued), Upper Skagit Indian Tribe, Sedro Wooley, Washington; Arthur W. Harrigan Jr., Tyler L. Farmer, and Bryn R. Pallesen, Harrigan Leyh Farmer & Thomsen LLP, Seattle, Washington; for Petitioner-Appellee Upper Skagit Indian Tribe

Lauren P. Rasmussen (argued), Law Offices of Lauren P. Rasmussen, Seattle, Washington, for Real-Parties-in-Interest Appellants Jamestown S'Klallam and Port Gamble S'Klallam Tribes.

Mason D. Morisset and Thane D. Somerville, Morisset Schlosser Jozwiak & Somerville PC, Seattle, Washington, for Petitioner-Appellee Tulalip Tribes.

Joseph V. Panesko, Assistant Attorney General, Office of the Washington Attorney General, Olympia, Washington, for Real-Party-in-Interest State of Washington.

Craig J. Dorsay, Corin La Pointe-Aitchison, and Lea Ann Easton, Dorsay & Easton LLP, Portland, Oregon, for Real-Party-in-Interest Hoh Indian Tribe.

Rob R. Smith, Kilpatrick Townsend & Stockton LLP, Seattle, Washington, for Real-Party-in-Interest Stillaguamish Tribe of Indians.

Maryanne E. Mohan, Suquamish Tribe, Suquamish, Washington; John W. Ogan, Law Office of John W. Ogan, Sisters, Oregon; for Real-Party-in-Interest Suquamish Indian Tribe.

Earle D. Lees III, Skokomish Indian Tribe, Shelton, Washington, for Real-Party-in-Interest Skokomish Indian Tribe.

Samuel D. Hough, Lower Elwha Klallam Tribe, Port Angeles, Washington; Stephen H. Suagee, Suagee Attorney at Law, Port Angeles, Washington; for Real-Party-in-Interest Lower Elwha Klallam Tribe.

Samuel J. Stiltner and Alec Wrolson, Puyallup Tribe of Indians, Tacoma, Washington, for Real-Party-in-Interest Puyallup Tribe of Indians.

**ORDER**

The slip opinion filed on September 11, 2023 is amended by changing the carryover paragraph on pages 40–41 to read as follows:

> The Lummi attempt to distinguish *Upper Skagit* on the ground that the court referenced a 1975 bench ruling from Judge Boldt, and that no such bench ruling is present in the record of this case. We see no legally relevant distinction. The *Upper Skagit* court merely noted that Judge Boldt's ruling from the bench further confirmed the absence of any record evidence of tribal fishing by the Suquamish in the disputed east-of-Whidbey-Island waters. 590 F.3d at 1025. We conclude that there is a similar lack of record evidence here.

An amended version of the opinion, reflecting this change, accompanies this order. With the opinion as amended, the panel has unanimously voted to deny the petition for panel rehearing filed on September 25, 2023 (Dkt. No. 93).

Accordingly, the petition for rehearing is **DENIED**. No further petitions for rehearing or rehearing en banc will be entertained.

**OPINION**

COLLINS, Circuit Judge:

This is the latest proceeding in a long-running case regarding Indian fishing rights in certain waters in Washington State. The governing law is a 1974 decree issued by Judge George Boldt of the U.S. District Court for the Western District of Washington, which settled various competing tribal rights arising from, *inter alia*, the 1855 Treaty of Point Elliott. We have interpreted that 1974 decree many times since its issuance, and these appeals call upon us to do so once again.

This proceeding was instituted by three Indian tribes who sought a ruling that the recognized fishing rights of the Lummi Nation ("the Lummi") under the 1974 decree do not extend to certain areas. Specifically, the current dispute centers on a single line in the decree recognizing that "the usual and accustomed fishing places" in which the Lummi have fishing rights "include[] the marine areas of Northern Puget Sound from the Fraser River south to the present environs of Seattle, and particularly Bellingham Bay." *United States v. State of Washington*, 384 F. Supp. 312, 360 (W.D. Wash. 1974) ("*Final Decision I*"). For the reader's convenience, the Fraser River, Seattle, and Bellingham Bay are shown here:[1]

---

[1] These physical maps are taken from the Bureau of Land Management's webpage, at https://webmaps.blm.gov/program_apps/BLM_Natl_Recreation_Opportunities/. We may properly take judicial notice of maps produced by a government agency for the limited purpose of elucidating, for the reader, the general locations of the relevant geographic areas. *Montana Green*



*Party v. Jacobsen*, 17 F.4th 919, 927 (9th Cir. 2021).  We have added markers for relevant geographic points in large font for the reader's convenience.

The question is whether the specific waters in dispute here—namely, the sheltered waters east of Whidbey Island and south of Fidalgo Island—fall within the Lummi's historical fishing territory.  For the reader's convenience, the approximate location of the disputed waters is shown here:



The district court ruled against the Lummi, holding that the disputed waters are not part of their historical fishing waters under the 1974 decree.  We affirm.

## I

## A

In 1854 and 1855, Isaac Stevens, Governor of what was then Washington Territory, signed a series of treaties with the Indian tribes of the Pacific Northwest.  One of those treaties was the 1855 Treaty of Point Elliott.**[2]**  Under the treaty's terms, the signatory tribes agreed to "cede, relinquish, and convey to the United States" much of their tribal land.  Treaty of Point Elliott, art. I, 12 Stat. 927 (1859).  But the tribes retained their "right of taking fish at usual and accustomed grounds and stations," which the Treaty "secured to said Indians in common with all citizens of the Territory."  12 Stat. at 928.  The Treaty did not specify, however, the precise location of those "usual and accustomed" fishing waters.  *Id.*

More than a century later, the questions left open by the various Stevens treaties sparked complex litigation in the U.S. District Court for the Western District of Washington between Indian tribes, the State of Washington, various non-Indian fishermen, and the United States.  In February 1974, District Judge George Boldt, who presided over that litigation, issued a wide-ranging decree to settle the parties' competing claims to "treaty right fishing" across the various

---

[2] Others included the Treaty of Medicine Creek, 10 Stat. 1132 (1855); the Treaty of Point No Point, 12 Stat. 933 (1859); the Treaty of Neah Bay, 12 Stat. 939 (1859); and the Treaty with the Yakamas, 12 Stat. 951 (1859).  Each treaty included similar language regarding Indian fishing rights in "usual and accustomed" areas.  *See Final Decision I*, 384 F. Supp. at 331.

waterways between the state capital and the Canadian border, some 135 miles to the north. *Final Decision I*, 384 F. Supp. at 327. Judge Boldt's decree purported to fix the location of "some," though "by no means all," of the "usual and accustomed fishing places" historically frequented by various Indian tribes in waters "of the State of Washington west of the Cascade Mountains and north of the Columbia River drainage area." *Id.* at 327–28, 333. This area covered more than 100 nautical miles and included "the American portion of the Puget Sound watershed, the watersheds of the Olympic Peninsula north of the Grays Harbor watershed, and the offshore waters adjacent to those areas." *Id.* at 327–28. Judge Boldt's wide-ranging decree was substantially affirmed by this court, *United States v. State of Washington*, 520 F.2d 676, 693 (9th Cir. 1975), and ultimately by the Supreme Court, *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 685–87 (1979).[3]

---

[3] The Supreme Court initially denied certiorari, 423 U.S. 1086 (1976), leaving our court's affirmance intact. However, when the Washington Supreme Court subsequently adopted a different reading of the Stevens treaties, the U.S. Supreme Court granted review of various federal and state decisions presenting that treaty interpretation issue. 443 U.S. at 672 & n.19, 674. The U.S. Supreme Court agreed with Judge Boldt that the treaty phrase "in common with all citizens of the Territory" referred to a group-based "right to take a [certain] share of each run of fish that passes through tribal fishing areas," rather than a mere "personal right to attempt to land fish" on the part of each individual tribal member, no different from the right to fish of any other citizen of Washington State. *Id.* at 674, 679; *see also Final Decision I*, 384 F. Supp. at 343; *Upper Skagit Indian Tribe v. Washington*, 590 F.3d 1020, 1022 (9th Cir. 2010). The Court, however, made certain modifications to the formula Judge Boldt used to calculate the tribal share of the fishing catch. 443 U.S. at 687–89.

Judge Boldt recognized, however, that a single decree could not definitively resolve every future dispute over tribal fishing rights anywhere in western Washington. *Final Decision I* therefore reserved the district court's continuing jurisdiction in two circumstances relevant here. First, any of the parties to the 1974 decree could invoke the district court's continuing jurisdiction to determine "whether or not the actions, intended or effected by any party (including the party seeking a determination) are in conformity with Final Decision # I." *Final Decision I*, 384 F. Supp. at 419. Second, any of the parties could request that the district court determine "the location of any of a tribe's usual and accustomed fishing grounds not specifically determined by Final Decision # I." *Id.* These two sources of retained jurisdiction appear, respectively, in Paragraphs 25(a)(1) and 25(a)(6) of the current, amended version of Judge Boldt's 1974 permanent injunction.[4] In effect, Paragraph 25(a)(1) allows the district court to adjudicate present-day disputes about what the 1974 decree really said. Paragraph 25(a)(6) allows the district court to adjudicate disputes about what the 1974 decree left *un*said—that is, historical fishing rights the 1974 decree did not purport to address at all.

In the nearly 50 years since Judge Boldt's 1974 decree, the Indian tribes of Washington State have often invoked the district court's continuing jurisdiction under Paragraph 25 to settle overlapping tribal claims to historical fishing waters. This court, in turn, has often been called upon to review the 1974 decree in the exercise of its appellate jurisdiction over the district court. The task of interpreting the occasionally

---

[4] These provisions, previously termed 25(a) and 25(f), were renumbered in a 1993 order amending paragraph 25 of the 1974 decree. *See United States v. Washington*, 18 F. Supp. 3d 1172, 1213 (W.D. Wash. 1993) (compiling various orders in the overall matter from 1991–1993).

cryptic terms of a decades-old decree, itself based on a sometimes thin record of anthropological evidence regarding the practices of Indian tribes more than a century earlier, has not always proved to be an easy one. Nonetheless, it remains the task we have today.

## B

This appeal involves a dispute among several Indian tribes over the waters east of Whidbey Island, a land formation that stretches approximately 37 miles north-to-south across Puget Sound. The disputed waters include Skagit Bay, directly south of the Swinomish Reservation; the Saratoga Passage between Whidbey Island and Camano Island; Port Susan, a bay separating Camano Island from the mainland; Holmes Harbor, a cove at the southern end of Whidbey Island; and Possession Sound, near the mainland city of Everett.

With respect to the core dispute on appeal, the parties are the Swinomish Indian Tribal Community; the Tulalip Tribes; the Upper Skagit Indian Tribe; and the Lummi Nation.[5] All four tribes bear respective rights under the Treaty of Point Elliott, as recognized in Judge Boldt's decrees,[6] and the primary issue on appeal concerns the

---

[5] For purposes of this case, the Lummi also include "the Semiahmoo and Samish Indians who were subsumed under the Lummi designation." *Final Decision I*, 384 F. Supp. at 360.

[6] For the Swinomish, see *Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 951 F.3d 1142, 1146 (9th Cir. 2020); *United States v. Washington,* 459 F. Supp. 1020, 1039 (W.D. Wash. 1978). For the Lummi, see *United States v. Lummi Nation*, 876 F.3d 1004, 1007 (9th Cir. 2017); *Final Decision I*, 384 F. Supp. at 360. For the Upper Skagit, see *Upper Skagit Indian Tribe v. Lundgren*, 138 S. Ct. 1649, 1651 (2018); *Final Decision I*, 384 F. Supp. at 379. For the Tulalip, see *Greene v. United States*, 996

fishing rights of the Lummi.  Specifically, the Lummi Nation—which, in a line of cases over the past two decades, has successfully persuaded this court to recognize the tribe's historical fishing rights in certain waters to the *west* of Whidbey Island, *see United States v. Lummi Nation*, 876 F.3d 1004, 1011 (9th Cir. 2017); *United States v. Lummi Indian Tribe*, 235 F.3d 443, 453 (9th Cir. 2000)—would like to fish in the waters *east* of Whidbey Island as well.  The Lummi are opposed in this endeavor by certain tribes who currently fish east of Whidbey Island: the Swinomish, the Tulalip, and the Upper Skagit.  Under the 1974 decree, one tribe's "usual and accustomed" fishing grounds are not legally exclusive of another's—that is to say, multiple tribes may, as a purely legal matter, have overlapping "usual and accustomed" fishing grounds.  *Final Decision I*, 384 F. Supp. at 332, 417.  But since the overall tribal catch is limited to "50 percent of the harvested fish from runs passing through [tribes'] off-reservation" usual and accustomed fishing grounds, *Upper Skagit Indian Tribe v. Washington*, 590 F.3d 1020, 1022 (9th Cir. 2010), each tribe has a practical incentive, via proceedings like the one before us, to eliminate fishing competition from other tribes in overlapping waters.

In October 2019, the Swinomish, Tulalip, and Upper Skagit filed a joint "Request for Determination" in the District Court for the Western District of Washington, invoking that court's continuing jurisdiction under Paragraph 25(a)(1) of Judge Boldt's 1974 permanent injunction.  The requesting tribes claimed that the Lummi, who planned to open a crab fishery east of Whidbey Island,

---

F.2d 973, 975 (9th Cir. 1993); *United States v. Lummi Indian Tribe*, 841 F.2d 317, 317 (9th Cir. 1988);*United States v. Washington*, 459 F. Supp. at 1039.

had no fishing rights in that area under the 1974 decree.  The tribes asked the district court for "a declaration to that effect," as well as an injunction "prohibiting Lummi from issuing regulations purporting to open any portion" of the disputed area "to Lummi fishing and prohibiting Lummi from fishing for any species in any portion" of the area.

The parties filed cross-motions for summary judgment.  The Swinomish's motion asked the court to declare that "the usual and accustomed fishing places" of the Lummi "do not include the secluded waters to the east of Whidbey Island" and to grant "permanent injunctive relief enjoining Lummi from fishing or authorizing its members to fish for any species" in the disputed waters.  The Upper Skagit's motion asked the court "to grant summary judgment in its favor by declaring that the area previously adjudicated to be the usual and accustomed grounds" of the Lummi Nation does not include the disputed "waters east of Whidbey Island."  The Tulalip's motion asked the court to "prohibit the Lummi Nation . . . from engaging in any fishing for finfish or shellfish" in the disputed waters; the Tulalip "also move[d] for a permanent injunction enjoining Lummi and its fishers from engaging in any fishing in the named Region."

The Lummi's motion, for its part, asked the court to "dismiss[] the Request for Determination" filed by the Swinomish, Upper Skagit, and Tulalip, and to "rul[e] that the Lummi's usual and accustomed fishing grounds and stations," as determined by Judge Boldt's 1974 decree, *do* "include marine areas . . . to the east of Whidbey Island," including all five of the specific areas in dispute here.

## C

The district court held for the Swinomish, Tulalip, and Upper Skagit, stating that the disputed waters were not

included in Judge Boldt's "determination of Lummi's usual and accustomed fishing grounds and stations."  The district court consequently denied the Lummi Nation's motion for summary judgment, granted summary judgment in part to the Swinomish, Upper Skagit, and Tulalip, and declared the matter closed on September 20, 2021.[7]  The Lummi filed a timely notice of appeal three days later.

On October 1, however, the Jamestown S'Klallam Tribe and Port Gamble S'Klallam Tribe (collectively, "S'Klallam") made an appearance.  The S'Klallam filed a motion for reconsideration asking the district court to "reconsider and amend certain language" from its summary judgment order.  The S'Klallam objected "particularly" to language in the district court's order that, in the S'Klallam's view, could be construed to imply that additional tribes, other than the Lummi, might have fishing rights in certain waters *west* of Whidbey Island where the S'Klallam claim fishing interests.  In the S'Klallam's view, the district court should have made clearer that only the *Lummi*, and not Indian tribes more generally, were covered by the challenged language in the district court's order.  The S'Klallam asked the court to "delete or reframe the [relevant] sentences to make clear the only precedent or law of the case created here is how *Lummi*," not *other* tribes, fished west of Whidbey Island.

The district court denied the S'Klallam's motion for reconsideration in a brief order.  The district court concluded that, because the Lummi had timely filed an appeal to our court, the district court had already lost jurisdiction over the

---

[7] Summary judgment was granted only "in part" because the district court denied, as unnecessary, the three tribes' requests for "permanent injunctive relief beyond that provided in the underlying case."

case (and hence jurisdiction to adjudicate the S'Klallam's motion for reconsideration). "[E]ven if the Court had jurisdiction to consider the motion for reconsideration," the district court continued, "the Court would deny the motion."

The S'Klallam then filed a timely notice of appeal seeking to "cross-appeal" the district court's original order of September 20, "as well as appeal" the court order denying the S'Klallam's October 1 motion for reconsideration.

## II

As noted above, this case asks us to determine the meaning of Judge Boldt's 1974 statement that the usual and accustomed fishing places of the Lummi Indians, at the time of the Treaty of Point Elliott in 1855, included "the marine areas of Northern Puget Sound from the Fraser River south to the present environs of Seattle, and particularly Bellingham Bay." *Final Decision I*, 384 F. Supp. at 360. Before addressing the meaning of that phrase, we first clarify the general principles that we have developed to interpret Judge Boldt's decrees—a set of principles we have often referred to as the "*Muckleshoot* framework," after a series of cases involving that Tribe.[8]

A court reviewing Judge Boldt's 1974 decree pursuant to Paragraph 25(a)(1) is interpreting a prior judicial decree and, as such, is carrying out what is ultimately a legal inquiry. *See United States v. DAS Corp.*, 18 F.4th 1032,

---

[8] Specifically, the referenced framework derives its name from three of our prior cases: *Muckleshoot Tribe v. Lummi Indian Tribe*, 141 F.3d 1355 (9th Cir. 1998); *United States v. Muckleshoot Indian Tribe*, 235 F.3d 429 (9th Cir. 2000); and *Muckleshoot Indian Tribe v. Lummi Indian Nation*, 234 F.3d 1099 (9th Cir. 2000). We have further developed that framework in a series of subsequent cases. *See generally Upper Skagit Indian Tribe v. Sauk-Suiattle Indian Tribe*, 66 F.4th 766 (9th Cir. 2023).

1040 (9th Cir. 2021).  In conducting that inquiry, we have explained, a reviewing court should construe the decree "so as to give effect to the intention of the issuing court"—*i.e.*, Judge Boldt—at the time the decree was written. *Muckleshoot Tribe v. Lummi Indian Tribe*, 141 F.3d 1355, 1359 (9th Cir. 1998) (citation omitted).  "We have sometimes described a subproceeding under paragraph 25(a)(1) as involving a 'two-step mode of analysis.'" *Upper Skagit Indian Tribe v. Sauk-Suiattle Indian Tribe*, 66 F.4th 766, 770 (9th Cir. 2023) ("*Sauk-Suiattle*") (citation omitted). We recently described that two-step inquiry as follows:

> At step one, a court uses the standard tools for interpreting precedent, starting with the text of the applicable Finding of Fact and considering the language at issue in the context of the Final Decision as a whole.  A court also considers the record evidence before Judge Boldt, along with any other evidence raised by the moving party that sheds light on Judge Boldt's understanding of geography at the time.  At this step, we have upheld a district court's decision as correctly interpreting Judge Boldt's opinion on the basis of information known to Judge Boldt and the words he chose.  However, whether the text of a Finding of Fact is unambiguous or not, a court must understand the Finding of Fact in light of the facts of the case, and so may proceed to step two to determine whether the moving party has carried the burden of showing that there was no evidence in the record before Judge Boldt, that favors the non-moving party's contrary

> interpretation of the Finding of Fact in a way that would undermine the moving party's theory of Judge Boldt's intent.

*Id*. at 770–71 (simplified).  The goal of both steps of "this two-step inquiry" is to "determine whether the moving party has carried its burden of showing that its interpretation of the Finding of Facts is consistent with Judge Boldt's intent."  *Id*. at 771.

Because fishing rights under the relevant treaties generally turn on the usual and accustomed fishing grounds ("U&A") of a particular tribe at the relevant time in history, the disputes presented to us under Paragraph 25(a)(1) of the decree typically involve a disagreement over the meaning of Judge Boldt's findings of fact concerning the historical U&A of the relevant tribes.  In particular, we have frequently been confronted with claims in which one tribe has invoked Paragraph 25(a)(1) to obtain an affirmative ruling that a competing tribe has *not* been granted certain fishing rights under that decree.

To the extent that the moving tribe seeks a ruling that Judge Boldt's findings as to a competing tribe's U&A do *not* cover a particular area, the fact that the decree's text does not unambiguously exclude the particular area from the competing tribe's U&A is not the end of the matter.  If the text of the relevant findings is susceptible to the moving party's interpretation that the competing tribe was excluded from the area, the moving party can carry its burden (at step two) by showing that there was no evidence before Judge Boldt that the competing tribe "fished or traveled through the contested areas."  *See Upper Skagit Indian Tribe v. Suquamish Indian Tribe*, 871 F.3d 844, 848 (9th Cir. 2017) ("*Suquamish*") (simplified).

That characterization of the burden applicable in that specific context flows directly from the nature of the underlying inquiry. Judge Boldt's 1974 decree stated that, for a fishing area to be "usual and accustomed," the tribe in question must have fished in that area on more than an "occasional and incidental" basis. *Final Decision I*, 384 F. Supp. at 353, 356. Mere travel through a set of waters was, in Judge Boldt's view, not sufficient to render a body of water a "usual and accustomed" fishing place for the traveling tribe. Although "[m]arine waters were . . . used as thoroughfares for travel by Indians who trolled en route," this sort of "occasional and incidental trolling was not considered to make the marine waters traveled thereon the usual and accustomed fishing grounds of the transiting Indians." *Id.* at 353; *see also United States v. Lummi Indian Tribe*, 841 F.2d 317, 320 (9th Cir. 1988) (stating that "travel through an area and incidental trolling are not sufficient to establish an area as a usual and accustomed fishing ground"). Because Judge Boldt must be understood to have followed his own announced standards in making his factual findings as to the various tribes' U&As, it follows that, if the record contains "*no evidence*" that the competing tribe "fished or traveled through the contested areas," *Suquamish*, 871 F.3d at 848 (simplified) (emphasis added), in a manner that "was more than 'incidental' or 'occasional,'" *United States v. Muckleshoot Indian Tribe*, 235 F.3d 429, 435 (9th Cir. 2000), then an ambiguous U&A finding concerning that competing tribe's fishing rights simply cannot be construed as including those contested areas. In other words, because Judge Boldt should not be understood to have made a finding that the record could not support under the standards he himself articulated, a moving party which carries its specific step-two burden under the *Muckleshoot* framework is

entitled to a determination under Paragraph 25(a)(1) that the competing tribe's U&A does not extend to the contested areas.

Our decision in *United States v. Muckleshoot Indian Tribe*, 235 F.3d 429, illustrates how this two-step inquiry works.  There, three tribes invoked Paragraph 25(a)(1), seeking a determination that the language of "Finding 76" in the 1974 decree, which concerned the U&A of the Muckleshoot tribe, "does *not* include any areas outside Elliott Bay." *See id*. at 431 (emphasis added).  The relevant language of Finding 76 stated that the Muckleshoot's U&A extended, "secondarily," to locations "in the saltwater of Puget Sound." *Id*. (quoting *Final Decision I*, 384 F. Supp. at 367) (emphasis omitted).  After evaluating all of the relevant record evidence before Judge Boldt, we concluded that there was no evidence in the 1974 record "that the Muckleshoot's ancestors had U&A fishing grounds beyond Elliott Bay." *Id*. at 435.  Thus, to the extent that the referent of "saltwater of Puget Sound" was ambiguous, the three moving tribes had shown that there was no evidence to support construing that phrase as extending beyond Elliott Bay.  *Id*.  We therefore affirmed the district court's summary judgment affirmatively holding that "the Muckleshoot's U&A under Finding 76 was limited to Elliott Bay." *Id*. at 432.

## III

Applying this *Muckleshoot* framework here and reviewing de novo, *see Tulalip Tribes v. Suquamish Indian Tribe*, 794 F.3d 1129, 1133 (9th Cir. 2015) ("*Tulalip Tribes*"), we conclude that the district court correctly held that the Swinomish, Tulalip, and Upper Skagit carried their burden to warrant a ruling, under Paragraph 25(a)(1), that

Judge Boldt's "determination of Lummi's usual and accustomed fishing grounds and stations" did not extend to the disputed waters at issue here.

## A

We have previously held that, as to waters *west* of Whidbey Island, Finding of Fact 46—the paragraph of Judge Boldt's decree determining the scope of the Lummi Nation's historical fishing grounds—is ambiguous, requiring us to "examine the record before Judge Boldt to clarify his intent." *United States v. Lummi Nation*, 876 F.3d 1004, 1009 (9th Cir. 2017) ("*Lummi III*"); *see United States v. Lummi Nation*, 763 F.3d 1180, 1187 (9th Cir. 2014) ("*Lummi II*"); *United States v. Lummi Indian Tribe*, 235 F.3d 443, 449 (9th Cir. 2000) ("*Lummi I*"). Considering Finding of Fact 46 in the relevant context, *see also Sauk-Suiattle*, 66 F.4th at 770–71, we reaffirm that conclusion today as to the waters *east* of Whidbey Island.

## 1

We begin with the decree's text.

Finding of Fact 45 states: "The Lummis had reef net sites on Orcas Island, San Juan Island, Lummi Island and Fidalgo Island, and near Point Roberts and Sandy Point. . . . They trolled the waters of the San Juan Islands for various species of salmon." *Final Decision I*, 384 F. Supp. at 360. Finding of Fact 14 states that these "Lummi reef net sites in Northern Puget Sound," among others, "are examples of some Indian usual and accustomed fishing grounds and stations in marine waters." *Id.* at 353. The boundaries of "Northern Puget Sound" are not defined in the decree. Finding of Fact 46— the key finding at issue in this case—states: "In addition to the reef net locations listed above, the usual and accustomed

fishing places of the Lummi Indians at treaty times included the marine areas of Northern Puget Sound from the Fraser River south to the present environs of Seattle, and particularly Bellingham Bay." *Id*. at 360.

Three points are worth noting about this last statement. First, if "the marine areas of Northern Puget Sound from the Fraser River south to the present environs of Seattle" included—as the Lummi argue—every single area of water between "the Fraser River" and "the present environs of Seattle," it is not clear why Judge Boldt would have listed the Lummi "reef net locations" in the San Juan Islands as a separate, distinct fishing ground. *Final Decision I*, 384 F. Supp. at 360. After all, the San Juan Islands—just like the separately listed reef net locations in marine waters at "Point Roberts," "Lummi Island," "Sandy Point," and "Fidalgo Island"—are located between the Fraser River and Seattle. Yet Finding of Fact 46 states that "[*i*]*n addition to*" their usual and accustomed fishing places at those locations, the Lummi's usual and accustomed fishing places *also* included "the marine areas of Northern Puget Sound from the Fraser River south to the present environs of Seattle." *Id.* (emphasis added). Where Judge Boldt used separate terms to refer to separate bodies of water, this court (naturally) understands him to have been referring to separate bodies of water. *Lummi I*, 235 F.3d at 451–52. So too would an ordinary reader, who could reasonably conclude that the waters around the listed reef net locations—despite their geographic position in waters directly between the Fraser River and Seattle—must not be part of "the marine areas of Northern Puget Sound from the Fraser River south to the present environs of Seattle." *Final Decision I*, 384 F. Supp. at 360. But if not all waters between the Fraser River and Seattle are included in that general description, which waters are?

Second, the geographic width of the U&A recognized in Finding of Fact 46 is left undefined.  More precisely, to the extent that the language might arguably be read as referring to some sort of path "from" the Fraser River "to" Seattle, the general words are unilluminating as to the width of any such path. *Final Decision I*, 384 F. Supp. at 360.  Those words could be referring to all waters anywhere on the map between any portion of the Fraser River and Seattle—a usage akin to the phrase "from sea to shining sea."  Finding of Fact 46 could also be referring to a narrower nautical path or paths traced southward "from" the Fraser River, through northern Puget Sound, "to" Seattle.  The decree itself, however, does not explain.

Finally, if Judge Boldt had intended to recognize Lummi fishing rights in every single body of water between the Fraser River and Seattle, it is not clear why he would have used the distinctive operative phrase "the marine areas of Northern Puget Sound from the Fraser River south to the present environs of Seattle."  If, in other words, Judge Boldt really used the term "Northern Puget Sound" to mean all waters north of Seattle and south of any portion of the Fraser River as the crow flies—as the Lummi argue—Judge Boldt could simply have said that the Lummi's usual and accustomed fishing grounds were "Northern Puget Sound," or he could have used other similarly broad language.  Why, then, the idiosyncratic phrasing?

## 2

The answer lies in an expert report concerning the history and practices of the Lummi Nation, authored by an anthropologist, Dr. Barbara Lane.  Judge Boldt relied heavily on Dr. Lane's report, which was entered into the 1974 trial record as Exhibit "USA-30," in authoring his

findings regarding the Lummi; indeed he cited the report 11 times in the space of five paragraphs.  (Judge Boldt also extensively cited a second report of Dr. Lane's, entered into evidence as "USA-20," which more broadly summarized her conclusions concerning all "Coast Salish and Nootkan speaking peoples residing west of the Cascade Mountains in the geographic area" at issue in *Final Decision I*.  Judge Boldt cited that broader report at least 35 times in the course of drafting the decree.)  Judge Boldt praised Dr. Lane's reports as "exceptionally well researched and reported," found their conclusions "established by a preponderance of the evidence," and declared them "authoritative and reliable summaries of relevant aspects of Indian life in the case area at and prior to the time of the treaties."[9]  *Final Decision I*, 384 F. Supp. at 350.

Indeed Judge Boldt's endorsement of Dr. Lane's findings was so thoroughgoing that he incorporated many of her findings about the Lummi directly into his decree, often with minimal (or no) modification.  Here are a few examples:

- **Dr. Lane**: "The single most valuable fish resource was undoubtedly the sockeye, which the Semiahmoo, Lummi, and Samish were able to intercept in the Straits on their annual migration from the ocean to the Fraser River."

---

[9] The "case area" is the area covered by Judge Boldt's decree: "that portion of the State of Washington west of the Cascade Mountains and north of the Columbia River drainage area," including "the American portion of the Puget Sound watershed, the watersheds of the Olympic Peninsula north of the Grays Harbor watershed, and the offshore waters adjacent to those areas."  *Final Decision I*, 384 F. Supp. at 328.

- o **Judge Boldt**: "The single most valuable fish resource was undoubtedly the sockeye, which the Lummis were able to intercept in the Straits on the annual migration of the sockeye from the ocean to the Fraser River." *Final Decision I*, 384 F. Supp. at 360.

- **Dr. Lane**: "Springs, silvers, and humpback were also taken with gill nets and springs were harpooned near the mouth of the Nooksack River," and "[s]teelhead were taken by harpoon at the mouth of Whatcom Creek and . . . in basketry traps."

  - o **Judge Boldt**: "These Indians also took spring, silver and humpback salmon and steelhead by gill nets and harpoons near the mouth of the Nooksack River, and steelhead by harpoons and basketry traps on Whatcom Creek." *Final Decision I*, 384 F. Supp. at 360.

- **Dr. Lane**: "When nature did not provide optimum conditions, the reefnetters artificially created them."

  - o **Judge Boldt**: "When nature did not provide optimum reef conditions the Indians artificially created them." *Final Decision I*, 384 F. Supp. at 360.

It is quite clear, in other words, that many of Judge Boldt's findings regarding the Lummi were copied, sometimes word-for-word, from Dr. Lane's expert report. Where Judge Boldt borrowed language directly from Dr. Lane's reports—

reports he expressly declared "authoritative and reliable"—
we think a rebuttable presumption is warranted that Judge
Boldt intended to adopt the meaning and scope that that
language possessed in the reports, and that the parties would
have shared that understanding at the time of decision. *See
Final Decision I*, 384 F. Supp. at 350.

**3**

That point is crucial to understanding the statement of
Judge Boldt's at issue in this case, regarding the Lummi
Nation's usual and accustomed fishing areas. Dr. Lane's
report on the Lummi covered this topic directly. Under the
headline "USUAL AND ACCUSTOMED FISHING
AREAS," Dr. Lane first outlined what she viewed as the
Lummi Nation's "home territory," which included a set of
"traditional fishing areas" that "extended from what is now
the Canadian border south to Anacortes," on the north side
of Fidalgo Island. (None of these areas are within the
disputed waters at issue here.) Dr. Lane then made her *only*
specific mention of Lummi fishing outside their home
territory. "In addition to the home territory discussed to this
point, Lummi fishermen were accustomed, at least in historic
times, and probably earlier, to visit fisheries *as distant as the
Fraser River in the north and Puget Sound in the south*"
(emphasis added).

That comment concluded Dr. Lane's findings describing
the U&A of the Lummi. She then listed a series of numbered
"CONCLUSIONS" that summarized the contents of the
report as already described. Conclusion 4, which closely
tracks the phrasing of the statement at the center of this case,
is the Conclusion relevant here. In Conclusion 4, Dr. Lane
summarized her earlier statement about Lummi fishing
outside the tribe's home territory. Dr. Lane repeated that in

addition to their "traditional fisheries" in their home territory north of Fidalgo Island, the Lummi also utilized other fisheries "*from the Fraser River south to the present environs of Seattle*" (emphasis added). This is, of course, precisely the same language Judge Boldt eventually used in the decree itself. And Judge Boldt cited, in using those words, the precise pages on which those same words appear in Dr. Lane's report. *See Final Decision I*, 384 F. Supp at 360 (citing Ex. USA-30, pp. 23–26).

The confusion in this case, we think, can be traced back to Dr. Lane's original finding—namely, that the Lummi "visit[ed] fisheries as distant as the Fraser River in the north and Puget Sound in the south." In using that phrase, Dr. Lane was merely describing the maximum north-south distance that the Lummi traveled to fish. The Lummi argue that Dr. Lane's reference to "Puget Sound in the south" refers to the east-of-Whidbey-Island waters disputed in this case, but that is wrong. By using the phrase "Puget Sound in the south," Dr. Lane was referring to the waters south of Admiralty Inlet, in the vicinity of Seattle. We know that because, when summarizing the relevant finding in her subsequent Conclusion 4, Dr. Lane used "the present environs of Seattle" as a synonym for her earlier reference to "Puget Sound in the south." In other words, Dr. Lane's original finding described the farthest two geographic points to which the Lummi ever traveled to fish: "Fraser River in the north" and "Puget Sound in the south," *i.e.*, the waters close to what is now Seattle. Dr. Lane's numbered Conclusion 4 then summarized her earlier finding, using slightly different words but repeating the same substance: "Other fisheries in the Straits and bays from the Fraser River south to the present environs of Seattle were utilized."

Viewed in this context, Dr. Lane's report concluded that the Lummi used various unspecified fisheries in the waters between the Fraser River and Seattle.  Consider for clarity a parallel sentence with more familiar locations.  "Other cities in the States and lands from Seattle east to the present environs of New York were visited" means that the visitor ranged as far as Seattle and New York, and also visited at least some other cities in between.  It does *not* mean that the visitor spent time in every single city between New York and Seattle.  Especially given the context of Dr. Lane's earlier finding—which described the Lummi as fishing in locations "*as distant as*" the Fraser River and "Puget Sound in the south," which she used to mean the waters near Seattle—it is clear Dr. Lane was *not* saying that the Lummi fished in *every single area of water between the Fraser River and Seattle*.  Nor would (indeed, could) Judge Boldt have understood her to be saying so.  Dr. Lane said simply that, outside the Lummi's home territory, "[o]ther fisheries in the Straits and bays from the Fraser River south to the present environs of Seattle were utilized."  Dr. Lane's report did not specify where those fisheries were, and she did not provide a citation for the conclusion that Lummi fishers ranged as far as the Fraser River and Seattle.

### 4

Judge Boldt's translation of Dr. Lane's language into his decree magnified, rather than resolved, the confusion.  First, Judge Boldt directly copied Dr. Lane's language about Lummi fishing grounds outside their historical home territory—*i.e.*, that the Lummi had visited various unspecified fishing areas in the marine waters "from the Fraser River south to the present environs of Seattle."  *Final Decision I*, 384 F. Supp. at 360.  Next, Judge Boldt blended in Dr. Lane's separate findings about the Lummi Nation's

traditional, home-water fishing grounds in what Judge Boldt apparently viewed as "Northern Puget Sound," including the tribe's historical center of gravity north of Whidbey Island, near "Bellingham Bay."  *Id.*   Evidently intending to emphasize the home-water nature of Bellingham Bay as described in Dr. Lane's report, Judge Boldt stated that the Lummi "particularly" fished there.  And he concluded by adding, at the beginning of the sentence, the phrase "the marine areas of Northern Puget Sound."  *Id.*  However, the phrase "Northern Puget Sound" is not defined in the 1974 decree.  Nor is the term "marine," which typically appears to refer to saltwater, but occasionally seems to connote open waters over which long-distance travel would have occurred—a usage that here would match the distinction Judge Boldt seems to have drawn between "the marine areas of Northern Puget Sound" and the saltwater passageways between and among the San Juan Islands, where the Lummi had reef net locations.  *See Final Decision I*, 384 F. Supp. at 353 ("Marine waters were also used as thoroughfares for travel by Indians who trolled en route," although "[s]uch occasional and incidental trolling was not considered to make the marine waters traveled thereon the usual and accustomed fishing grounds of the transiting Indians").

The result is a cobbled-together, patchwork sentence containing three elements: (1) "the marine areas of Northern Puget Sound," (2) "from the Fraser River south to the present environs of Seattle," and (3) "particularly Bellingham Bay." *Final Decision I*, 384 F. Supp. at 360.  Except for Bellingham Bay, which is clearly identified as a Lummi usual and accustomed fishing ground, the remaining two elements provide little clarity.  "Northern Puget Sound" has no defined boundaries in the decree, so it is difficult to tell whether Judge Boldt considered any waters east of Whidbey

Island to fall within the term's scope in 1974. Even if he did, the unusual remaining term, "from the Fraser River south to the present environs of Seattle," is copied directly from Dr. Lane's report, where it operated as a diffuse reference to a set of unidentified fishing waters and plainly did not include every single body of water between the Fraser River and Seattle. Nor, despite Judge Boldt's use of directional "from" and "to" language, does the decree clarify whether it is referring to a particular path of nautical travel from one point to the other—much less what that path (or paths) might be.

It is, in short, fundamentally ambiguous—even after reading the language of Finding of Fact 46 in light of the record evidence before Judge Boldt at the time of decision— whether Judge Boldt and the parties, in 1974, would have understood "the marine areas of Northern Puget Sound from the Fraser River south to the present environs of Seattle, and particularly Bellingham Bay," to include any waters east of Whidbey Island. 384 F. Supp. at 360. We must—as in all three *Lummi* cases preceding us—turn to further examination of the record evidence before Judge Boldt.

## B

We proceed to step two of the *Muckleshoot* framework. As we have noted, here, the Swinomish, Tulalip, and Upper Skagit moved for a determination, under Paragraph 25(a)(1), that the Lummi's U&A, as described in Finding of Fact 46 of the decree, does *not* include the disputed waters east of Whidbey Island. These tribes' burden under step two, accordingly, is to show that there was no evidence in the record before Judge Boldt of historical Lummi fishing in the disputed waters beyond what would be merely incidental or occasional. *Sauk-Suiattle*, 66 F.4th at 771, 774; *Suquamish*, 871 F.3d at 848; *Tulalip Tribes*, 794 F.3d at 1133. We think

the moving parties have met that burden here. Indeed, there is no record evidence that the Lummi historically fished in waters east of Whidbey Island.

**1**

The Lummi point to a few excerpts from the 1974 trial record, but all of them are either irrelevant or entirely speculative.

First, the Lummi point out that Dr. Lane's report contained a map listing a lone Lummi reef net site off the *western* side of Fidalgo Island:



This reef net site is plainly not within the disputed east-of-Whidbey-Island waters, and we consequently see nothing to be gained from it.

Second, the Lummi point to an exhibit in the 1974 trial record—*viz*., Exhibit PL-94w.  Exhibit PL-94w is a confusingly worded affidavit from the late 19th century, submitted as part of the case that eventually became *United States v. Alaska Packers' Ass'n*, 79 F. 152 (C.C.D. Wash. 1897).  That case involved "a suit by the United States and certain Indians of the Lummi tribe for an injunction against the Alaska Packers' Association . . . to protect the Lummi Indians in the right to take salmon, by their ancient and primitive means of fishing, *in the waters adjacent to Point Roberts*," an area far to the north of the waters disputed here. *Id.* at 153 (emphasis added).  In June 1895, B.N. McDonough, a 60-year-old "Indian Trader" who had lived on or near the Lummi Reservation since 1871, submitted an affidavit in the case.  McDonough stated that "during all the time I have known these [I]ndians they have fished at all points in the lower Sound and wherever the run of fish was greatest and the salmon were most easily taken including Point Roberts."  McDonough did not explain what he meant, in 1895, by "the lower Sound," and the only specific geographic reference he made in conjunction with the term was to Point Roberts, some 40 miles to the north of the waters at issue in this case.  McDonough also stated that the Lummi "have always fished at all the usual fishing places within many miles of their Reservation including Point Roberts and Vill[a]ge Point."  Again, McDonough did not explain what these "usual fishing places" were, and Village Point is located on Lummi Island in Lummi home waters, far to the north of Whidbey and Fidalgo Islands.  (Dr. Lane's summary report, in fact, described these two locations quite

precisely: "The principal fisheries of the Lummi included the reef-net locations for sockeye at Point Roberts, Village Point, off the east coast of San Juan Island as well as other locations in the San Juan Islands.")  McDonough's affidavit is, in short, no evidence at all of Lummi fishing east of Whidbey Island and south of Fidalgo Island.

Third, the Lummi point to a single sentence from the 1973 trial testimony of a Lummi tribal elder named Forrest "Dutch" Kinley.  Kinley was born around 1913, nearly six decades after the Treaty of Point Elliott.  He had worked in fishing since he was around 12 years old—sometime in the early 1920s—and at one point served as chairman and a member of the Lummi tribal council.  Kinley testified extensively on various topics regarding the Lummi tribe; indeed, the transcript of his testimony runs more than 90 pages.  The Lummi point to a single page of this extensive transcript where, on redirect examination, Kinley testified that "I have fished in the Straits, I have fished *in Whidby Island south* and into the Canadian border" (emphasis added).  When asked whether this and other fishing was "as a Lummi Indian at your usual and accustomed places," Kinley answered "Yes."

This fragment of transcript is patently insufficient to show historical Lummi fishing rights east of Whidbey Island, for at least two reasons.  First, the parties agree that Judge Boldt did not cite Kinley's testimony at all in Finding of Fact 46.  There is consequently no way to know, unlike in the case of Dr. Lane's reports, what Judge Boldt thought about Kinley's testimony (if he thought about it at all).  Second, there is no way to know what Kinley meant by his confusing statement that he had fished "in Whidby Island south."  Kinley could have meant, quite uncontroversially, that he fished south of Whidbey Island in the "environs of

Seattle," the maximum range point of Lummi fishing described in Dr. Lane's report and in Judge Boldt's decree. Kinley could also have meant that he fished somewhere near the western coast of Whidbey Island, "south" of the Lummi reefnets in the San Juan Islands. There is absolutely no evidence that by fishing "in Whidby Island south," Kinley meant fishing in the waters *east* of Whidbey Island. Any inference to the contrary is entirely speculative.

Finally, the Lummi rely on an extraordinarily thin chain of inference from two statements by Dr. Lane regarding Lummi trade practices. Dr. Lane wrote that the Lummi "apparently imported various fibers and grasses from upriver Skagit and flint from Puget Sound." She also stated that the "imports" of the Semiahmoo people, whom Judge Boldt described as "subsumed" within the Lummi for purposes of the Treaty (*Final Decision I*, 384 F. Supp. at 360), included "[f]lint from Puget Sound and woven root hats from the West Coast." From these two isolated statements, the Lummi draw the following chain of inferences: (1) the Lummi traded fish and clams for "woven root hats" and "imported various fibers and grasses from upriver Skagit"; (2) "[b]ecause the Skagit River empties into waters disputed here," the Lummi must have traveled to the area surrounding the mouth of the Skagit River, on "the mainland shore on the eastern side of the disputed waters," to obtain the aforementioned "woven root hats" and "various fibers and grasses"; and (3) this travel, in turn, "confirms Lummi's travel (and fishing) throughout" the disputed waters. This speculative line of reasoning is unavailing.

For one thing, Dr. Lane describes the Lummi as having "imported" the land-based goods in question. This importation process *could* have taken the form of Lummi traders traveling to visit the Skagit; it could also have

occurred via Skagit traders traveling to visit the Lummi; or trade between the two areas could have occurred via middlemen from neither tribe.  There is simply no way to know on this record.  Second, even if the Lummi *did* trade by traveling to the mouth of the Skagit River, there is no evidence in the record that, upon their (hypothetical) arrival, the Lummi ever *fished* there—much less for any period of time sufficient to create "usual and accustomed" fishing grounds.  *See Final Decision I*, 384 F. Supp. at 353, 356 (fishing must have been more than "occasional and incidental" to qualify an area as a "usual and accustomed" fishing ground).  The Lummi's chain of inferences is entirely speculative and ungrounded in the record, as the district court in this case correctly observed.

In sum, there is no evidence in the record before Judge Boldt that the Lummi ever held usual and accustomed fishing grounds in waters east of Whidbey Island and south of Fidalgo Island.  Nor did Judge Boldt mention, anywhere in the text of his description of historical Lummi fishing waters, the specific waters east of Whidbey Island at issue in this case.  We thus conclude that, under the 1974 decree, the Lummi have no usual and accustomed fishing rights in those waters.

## 2

The record evidence cited by Judge Boldt in Finding of Fact 46 suggests, if anything, the opposite: that Lummi fishing was confined to areas west and, in particular, north of Whidbey Island.

Exhibit PL-94e is another 1895 affidavit in the *Alaska Packers* case, this time from a man named George Sknoughton.  Sknoughton stated that he was a Lummi Indian who was 60 years old at the time of the affidavit; he was

therefore born around 1835, and would have been approximately 20 years old at the time of the Treaty of Point Elliott.  Sknoughton explained that the Lummi at treaty times "got most of their fish at Point Roberts," a location some 40 miles to the north of the disputed waters here, and that "at no other place in the waters near the reservation did the sockeye salmon run [in] such large quantities or were they so easily caught."

Exhibit PL-94u is an 1895 affidavit from Harry Sewalton, who identified himself as a 65-year-old "member of the Lummi Tribe of Indians."  According to Sewalton, "the main part of the food supply of the Lummi Indians since my boyhood" was taken at the reef adjacent to Point Roberts. Sewalton explained that "Point Roberts reef and the Reef at Vill[a]ge Point on Lummi Island . . . are the *only* two reefs in the waters of said County or in the Lower Sound upon which the said Lummi Indians can take salmon with hand or lift nets" (emphasis added).

Exhibit G-26 is a section of an untitled and undated report by an unknown author.  The report states that "[t]he area claimed by the Indians who designate themselves as the Lummi Tribe of Indians and the San Juan Tribe of Indians includes the sites of autonomous Indian villages along the coastal region *north* of Puget Sound proper, around Bellingham, Lummi and Birch Bays, and on some of the islands of the San Juan Archipelago" (emphasis added). "Settlement of the northern area" inhabited by these Indians, according to the author, differed considerably from that in the "southern part of the basin" where "Seattle, Tacoma, and Olympia" were located.

Finally, we note that in spring 1973, the Washington Reef Net Owners Association served interrogatories

requesting the Lummi Nation to identify "*in full all locations* which are claimed to be its 'usual and accustomed fishing places and stations within and contiguous to the western portion of the State of Washington'" (emphasis added). The Lummi's answer repeated verbatim Dr. Lane's statement that "[t]he traditional fishing areas" extended "from what is now the Canadian border south to Anacortes"; the Lummi then cited a series of locations drawn directly from Dr. Lane's reports. These included Haro and Rosario Straits, "the salt waters contiguous to the San Juan Islands," Point Roberts, Lummi Island, Fidalgo Island, Birch Bay, Village Point, Cherry Point, and various reef-net locations in the San Juan Islands. These are essentially the same areas identified by Dr. Lane in her description and map of Lummi fishing locations—which makes perfect sense, because the Lummi specifically identified Dr. Lane as the source of their information regarding historical reef-net fishing. None of the areas the Lummi identified in 1973 are east of Whidbey Island; indeed, none are remotely near the "present environs of Seattle." The Lummi did state that "[t]here were, in addition, other important fisheries," but the Lummi did not name any of them, so that general statement is of no use. We find it telling that, asked directly to identify "in full all locations" claimed to be their "usual and accustomed" fishing grounds in 1973, the Lummi mentioned *no* fishing locations east of Whidbey Island and south of Fidalgo Island. The Lummi had the opportunity to claim such locations at trial and did not.

## C

Our precedent is in accord with these conclusions.

## 1

The most on-point case, and one involving two of the same bodies of water at issue here, is *Upper Skagit Indian Tribe v. Washington*, 590 F.3d 1020 (9th Cir. 2010) ("*Upper Skagit*"). That case involved a dispute between the Upper Skagit and the Suquamish as to whether Saratoga Passage and Skagit Bay—two of the bodies of water east of Whidbey Island at issue here—fell within the scope of yet another of Judge Boldt's vaguely worded classifications: "the marine waters of Puget Sound from the northern tip of Vashon Island to the Fraser River including Haro and Rosario Straits, the streams draining into the western side of this portion of Puget Sound and also Hood Canal." *Id.* at 1023 (quoting *Final Decision I*, 384 F. Supp. at 1049). As in this case, the waters at issue in *Upper Skagit* were east of Whidbey Island, and the statement of Judge Boldt's at issue in the case concerned "the marine waters of Puget Sound" between a southern anchor point and the Fraser River. (There, the southern anchor point was Vashon Island, which lies directly to the southwest of Seattle, the anchor point in this case. We see no relevant difference between these two anchor points; both are located due south of the disputed east-of-Whidbey-Island waters.)

Faced with a comparable (and equally vague) description of "the marine waters of Puget Sound" between a southern anchor point and "the Fraser River," the *Upper Skagit* court turned (just as we turn) to the record evidence before Judge Boldt. The *Upper Skagit* court found dispositive the fact that "[t]here is no evidence in the record before Judge Boldt that the Suquamish fished or traveled in the waters on the eastern

side of Whidbey Island, particularly in Saratoga Passage or Skagit Bay." 590 F.3d at 1025. (The same, as we have explained, is true of the Lummi in this case.) Moreover, "[a]lthough Lane's Report showed that several areas on the *west* shores of Area Four comprised Suquamish's on-reservation territory and fishing locations, there was no evidence from Lane or otherwise that the *east* shores of Area Four, as well as Skagit Bay and Saratoga Passage," were included. *Id.* (emphasis added). (Much the same is, as we have explained, true here: Dr. Lane's report contained a map showing a Lummi fishing site on the *west* shores of Fidalgo Island, but none on the *eastern* shores of the disputed waters.) Finally, when Judge Boldt "intended to include an area, it was specifically named"; thus, the fact that "Judge Boldt neglected to include Skagit Bay and Saratoga Passage in the Suquamish's U&A supports our conclusion that he did not intend for them to be included." *Id.* (The same is again true in this case; the fact that Judge Boldt named three areas outside the Whidbey-Fidalgo Island chain—the San Juan Islands, Bellingham Bay, and Seattle—but did not name any waters east of Whidbey Island, suggests that he did not intend to include them.) Ultimately, the *Upper Skagit* court concluded, the Suquamish U&A did not include the contested waters east of Whidbey Island. *Id.* at 1026. We reach precisely the same conclusion, regarding an analogous U&A description, in this case.

The Lummi attempt to distinguish *Upper Skagit* on the ground that the court referenced a 1975 bench ruling from Judge Boldt, and that no such bench ruling is present in the record of this case. We see no legally relevant distinction. The *Upper Skagit* court merely noted that Judge Boldt's ruling from the bench further confirmed the absence of any record evidence of tribal fishing by the Suquamish in the

disputed east-of-Whidbey-Island waters. 590 F.3d at 1025. We conclude that there is a similar lack of record evidence here.

If anything, *Upper Skagit* is the harder case. There, Judge Boldt's description was not limited to the undefined area of "northern" Puget Sound, as it is here; he instead described the Suquamish U&A as simply including, without qualification, "the marine waters of Puget Sound." 590 F.3d at 1023. Nonetheless, we declined to read into that language, in the absence of any record evidence, an inference that waters east of Whidbey Island were included. *Id.* at 1026. We reach the same conclusion here, and on easier facts. As the district court in this case correctly observed, if "Suquamish's U&A was determined to be ambiguous as to whether it included Skagit Bay and Saratoga Passage," then there is "no reason that Lummi's *more restrictive* U&A should unambiguously include the Disputed Waters" (emphasis altered).

## 2

Our 2017 decision in *Lummi III*, 876 F.3d 1004, is likewise in accord. In that case, we "examine[d] the record before Judge Boldt to clarify his intent" regarding a particular "nautical path" traced "from the San Juan Islands to Seattle" in *Lummi I*, 235 F.3d at 452. *See Lummi III*, 876 F.3d at 1009–10. We concluded that Judge Boldt had meant to include waters along that "nautical path" in the Lummi's usual and accustomed fishing territory. *Id.* at 1009–10 (citation omitted). That nautical path does not cut through any waters east of Whidbey Island, so neither *Lummi I* nor *Lummi III* governs the waters at issue in this case.

The Lummi nonetheless urge us to read *Lummi III* to stand for the broad proposition that a court may infer Lummi

fishing rights in *any* area of Puget Sound between the Fraser River and Seattle through which the Lummi might, at some point, have traveled.  We have never held that, and we decline to do so now.  And for good reason: that limitless holding would be inconsistent with both the text of the decree and well-established precedent.

Again, Judge Boldt's decree clearly states that, although "[m]arine waters were . . . used as thoroughfares for travel by Indians who trolled en route," this sort of "occasional and incidental trolling *was not considered to make the marine waters traveled thereon the usual and accustomed fishing grounds of the transiting Indians*."  384 F. Supp. at 353 (emphasis added).  Judge Boldt plainly did not believe that the possibility of travel in disputed waters was sufficient to support a finding of U&A fishing there.  He stated precisely the opposite.  Accordingly, we cannot, when reading ambiguous language in the decree, understand Judge Boldt to have violated his own cardinal principle for discerning usual and accustomed fishing grounds (*i.e.*, by recognizing fishing rights for the Lummi in waters east of Whidbey Island, where, as we have explained, there is no record evidence that such fishing ever occurred).  *See Suquamish*, 871 F.3d at 848; *Tulalip Tribes*, 794 F.3d at 1133; *see also Sauk-Suiattle*, 66 F.4th at 771, 774.  Since we have thrice concluded (today makes four) that Judge Boldt's vague description of the Lummi's U&A is ambiguous, that same admonition applies here and precludes the Lummi's sweeping argument.  *See Lummi III*, 876 F.3d at 1008–09; *Lummi II*, 763 F.3d at 1187; *Lummi I*, 235 F.3d at 449.

The Lummi's limitless reading of *Lummi III* suffers from an additional flaw—namely, that it would render *Lummi III* directly inconsistent with *Upper Skagit*, 590 F.3d 1020, in which we *declined* to infer fishing rights east of Whidbey

Island from materially identical language in another of Judge Boldt's U&A descriptions. *Id.* at 1023, 1026. As we have said, the two cases are, properly understood, perfectly consistent. *Lummi III* concluded, after "examin[ing] the record before Judge Boldt to clarify his intent," that Judge Boldt had meant to include waters along a specific west-of-Whidbey-Island "nautical path" in the Lummi's historical fishing territory. 876 F.3d at 1009–10. *Upper Skagit* concluded, after engaging in the same sort of inquiry, that Judge Boldt had *not* meant to include certain east-of-Whidbey-Island waters in the Suquamish's historical fishing territory. 590 F.3d at 1023, 1026. We apply in this case the same standards we applied in *Lummi III* and *Upper Skagit*. We have "examine[d] the record before Judge Boldt to clarify his intent" regarding a set of waters as to which the decree is ambiguous. *Lummi III*, 876 F.3d at 1009. Because there is no evidence in that record of historical Lummi fishing east of Whidbey Island, we decline to read the decree to grant the Lummi fishing rights east of Whidbey Island. *See Sauk-Suiattle*, 66 F.4th at 771, 774; *Suquamish*, 871 F.3d at 848; *Tulalip Tribes*, 794 F.3d at 1133.

**IV**

The remainder of the dispute before us is easily resolved. The S'Klallam Tribe has filed a cross-appeal for the sole purpose of objecting to what it views as "damaging and erroneously broad statements" in the district court's summary judgment order that, in the S'Klallam's view, appear to suggest that many Indian tribes fished in waters *west* of Whidbey Island, where the S'Klallam claim fishing interests. Specifically, the S'Klallam express concern about two sentences of the "current language in the district court decision": first, the district court's statement that "the Ninth Circuit . . . previously determined that the waters west of

Whidbey Island served as the primary thoroughfare for tribes traveling between the Fraser River and the environs of Seattle," and second, the district court's statement that these waters were "the main north-south thoroughfare" for tribes transiting through Puget Sound en route to Seattle.  In the S'Klallam's view, this language incorrectly implies that "*other* tribes," in addition to the Lummi, now have leeway to "also claim the western route as their primary route" for fishing and travel (emphasis added).  The S'Klallam's concern appears to be that an unknown number of other tribes may seize on the district court's language to attempt to justify increased fishing west of Whidbey Island, potentially leading to new incursions upon the "S'Klallam U&A on the west side of Whidbey Island."  The S'Klallam ask us to make "modifications to the district court's order" in response; in other words, they request that we delete (or change the phrasing of) the passages to which the S'Klallam object.  The S'Klallam take no position, however, on whether we should affirm or reverse the underlying judgment in the dispute between the Lummi and the Swinomish, Tulalip, and Upper Skagit; indeed, they concede that their desired modifications to the district court's order "may or may not reverse the outcome."

Generally speaking, a litigant may "appeal only if the judgment gives him less relief than he considers himself entitled to"; he "cannot appeal a judgment merely because there are passages in the court's opinion that displease him," even if those passages may "come back to haunt him in a future case."  *Abbs v. Sullivan*, 963 F.2d 918, 924 (7th Cir. 1992).  In any event, we have already concluded, in the ordinary course of deciding the dispute between the Lummi and the Swinomish, Tulalip, and Upper Skagit, that neither *Lummi III* nor *Upper Skagit* stands for the proposition that

all tribes (indeed, any tribe besides the Lummi) traveled and fished west of Whidbey Island. (The district court explained much the same in its order denying reconsideration.) Nor, as we have just explained, do our cases stand for the proposition that the mere possibility of travel through disputed waters is sufficient to support a grant of U&A rights there—a principle Judge Boldt directly rejected and we likewise have never accepted. Having already clarified both points in the S'Klallam's favor in the ordinary course of disposing of the Lummi's appeal, we consider the S'Klallam's appeal moot.

We decline to address the parties' dispute regarding whether the Lummi may initiate a future subproceeding *under Paragraph 25(a)(6)*, which addresses a separate basis for jurisdiction not presented to the district court in this case. *Cf. Muckleshoot Indian Tribe v. Tulalip Tribes*, 944 F.3d 1179 (9th Cir. 2019). We do not understand that question to have been resolved by the district court and we decline to address it in the first instance on appeal. *Merritt v. Countrywide Fin. Corp.*, 759 F.3d 1023, 1035 (9th Cir. 2014).

**V**

The district court's grant of summary judgment to the Swinomish, Tulalip, and Upper Skagit is AFFIRMED. The S'Klallam's cross-appeal of the district court's grant of summary judgment is DISMISSED AS MOOT. The S'Klallam's appeal of the district court's denial of the S'Klallam's motion for reconsideration is likewise DISMISSED AS MOOT.