**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STILLAGUAMISH TRIBE OF
INDIANS,

     *Petitioner-Appellant*,

  v.

STATE OF WASHINGTON; UPPER
SKAGIT INDIAN TRIBE,

     *Respondents-Appellees*,

TULALIP TRIBES; NISQUALLY
INDIAN TRIBE,

     *Intervenors-Appellees*,

HOH INDIAN TRIBE; SWINOMISH
INDIAN TRIBAL COMMUNITY;
QUILEUTE INDIAN TRIBE;
MUCKLESHOOT INDIAN TRIBE;
SUQUAMISH TRIBE; SKOKOMISH
INDIAN TRIBE; SQUAXIN ISLAND
TRIBE; PORT GAMBLE
S'KLALLAM TRIBE; JAMESTOWN
S'KLALLAM TRIBE,

     *Interested Party-Appellees*.

No. 23-35066

D.C. Nos.
2:17-sp-00003-
RSM
2:70-cv-09213-
RSM

OPINION

Appeal from the United States District Court
for the Western District of Washington
Ricardo S. Martinez, District Judge, Presiding

Argued and Submitted February 9, 2024
Portland, Oregon

Filed May 21, 2024

Before:  Ronald M. Gould, Jay S. Bybee, and Daniel A.
Bress, Circuit Judges.

Per Curiam Opinion;
Concurrence by Judge Bress;
Concurrence by Judge Gould

## SUMMARY[*]

### Fishing Rights

The panel vacated the district court's order granting judgment on partial findings against the Stillaguamish Tribe of Indians ("Tribe") in Sub-proceeding 17-3 of *United States v. Washington*, 384 F. Supp. 312 (W.D. Wash. 1974) ("*Final Decision #1*"), determining the Tribe's usual and accustomed fishing grounds ("U&As") under the Treaty of Point Elliott.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The district court determined that the Tribe's U&As did not include the marine waters of Port Susan, Skagit Bay, Saratoga Passage, Penn Cove, Holmes Harbor, or Deception Pass (collectively "the Claimed Waters").

The panel held that the district court properly applied the law of the case as set forth in *Final Decision #1* and its various sub-proceedings. However, the district court did not make sufficient factual findings to enable this court's review; and therefore, the panel could not affirm the district court on the threadbare record before it. The panel vacated the district court's order and remanded for further factual findings as to the Tribe's evidence of villages, presence, and fishing activities in the Claimed Waters.

Judge Bress, joined by Judge Bybee, concurred, and wrote to suggest a path forward for assessing the continued necessity and scope of the fifty-year injunction in *Final Decision #1*.

Concurring, Judge Gould wrote to indicate he did not share the jurisdictional concerns raised in Judge Bress's concurrence, which do not relate to the controversy in this case.

---

## COUNSEL

Bree R. Black Horse (argued) and Rob R. Smith, Kilpatrick Townsend & Stockton LLP, Seattle, Washington; Raven Arroway-Healing, Stillaguamish Tribe of Indians, Arlington, Washington; for Petitioner-Appellant Stillaguamish Tribe of Indians.

David S. Hawkins (argued), Upper Skagit Indian Tribe, Sedro Wooley, Washington; Tyler L. Farmer and Ariel A.

Martinez, Harrigan Leyh Farmer & Thomsen LLP, Seattle, Washington; for Respondent-Appellee Upper Skagit Indian Tribe.

Emily H. Haley (argued) and James M. Jannetta, Swinomish Indian Tribal Community, Office of the Tribal Attorney, La Conner, Washington; David N. Bruce and Duffy Graham, Savitt Bruce & Willey LLP, Seattle, Washington; for Interested Party-Appellee Swinomish Indian Tribal Community.

John Heidinger, Joseph V. Panesko, and Koalani Kaulukukui; Assistant Attorneys General; Office of the Washington Attorney General (Olympia), Olympia, Washington; for Respondent-Appellee State of Washington.

Lauren P. Rasmussen, Law Offices of Lauren P. Rassmussen PLLC, Seattle, Washington, for Interested Party-Appellees Jamestown S'Klallam and Port Gamble S'Klallam Tribes.

Craig J. Dorsay, Lea Ann Easton, Kathleen M. Gargan, and Corin La Pointe-Aitchison, Dorsay & Easton LLP, Portland, Oregon, for Interested Party-Appellee Hoh Indian Tribe.

Robert L. Otsea, II, Chief Counsel; Richard Reich and Laura Weeks, Staff Attorneys; Muckleshoot Indian Tribe, Office of the Tribal Attorney, Auburn, Washington, for Interested Party-Appellee Muckleshoot Indian Tribe.

Maryanne E. Mohan, Suquamish Tribe, Suquamish, Washington, for Interested Party-Appellee Suquamish Tribe.

Earle D. Lees, III, Skokomish Indian Tribe, Shelton, Washington, for Interested Party-Appellee Skokomish Indian Tribe.

David Babcock, Sharon I. Haensly, and Kevin Lyon, Squaxin Island Legal Department, Shelton, Washington, for Interested Party-Appellee Squaxin Island Tribe.

Mason D. Morisset and Thane D. Somerville, Morisset Schlosser Jozwiak & Somerville PC, Seattle, Washington, for Intervenor-Appellee Tulalip Tribes.

Megan E. Gavin, Cascadia Law Group PLLC, Seattle, Washington; Jay J. Manning, Cascadia Law Group PLLC, Olympia, Washington; for Intervenor-Appellee Nisqually Indian Tribe.

**OPINION**

PER CURIAM:

The Stillaguamish Tribe of Indians ("Stillaguamish" or "the Tribe") appeals an order from the District Court for the Western District of Washington granting judgment on partial findings against the Tribe. In a sub-proceeding of *United States v. Washington*, the district court determined that Stillaguamish's usual and accustomed fishing grounds ("U&As") under the Treaty of Point Elliott, Jan. 22, 1855, 12 Stat. 927, did not include the marine waters of Port Susan, Skagit Bay, Saratoga Passage, Penn Cove, Holmes Harbor, or Deception Pass (collectively "the Claimed Waters"). We vacate the judgment of the district court and remand for further factual findings.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Stillaguamish is one of several federally recognized Indian tribes that have inhabited the coastal area of northwestern Washington near Puget Sound since before

European contact.  The Tribe was one of the signatories to the Treaty of Point Elliott, whereby the indigenous peoples of that region ceded land to the United States government in 1855.  *United States v. Washington (Final Decision #1)*, 384 F. Supp. 312, 355 (W.D. Wash. 1974).  Under the terms of that treaty, the United States secured the signatory tribes' "right of taking fish at usual and accustomed grounds and stations."  Treaty of Point Elliott art. 5.

Modern adjudication of this treaty provision began in 1970, when the United States—on its own behalf and as trustee of the interested tribes—sued the State of Washington and several of its agencies to enjoin state regulations that were interfering with the fishing rights of the tribes under the treaty.  *Final Decision #1*, 384 F. Supp. at 327.  In deciding that initial controversy, Judge George Boldt defined the treaty term "usual and accustomed grounds and stations" as meaning "every fishing location where members of a tribe customarily fished from time to time at and before treaty times, however distant from the then usual habitat of the tribe, and whether or not other tribes then also fished in the same waters."  *Id.* at 332.  He further clarified that the tribes' fishing rights under the treaty did not extend to "unfamiliar locations and those used infrequently or at long intervals and extraordinary occasions."  *Id.*

In a detailed opinion, Judge Boldt synthesized available anthropological and ethnographic evidence in order to set forth the U&As of all the plaintiff tribes involved in the suit.  For the Stillaguamish—who had intervened as plaintiff shortly after the United States initiated the action, *id.* at 327 n.2—its U&As were determined to consist of "the area embracing the Stillaguamish River and its north and south forks," *id.* at 379.  There was no discussion of evidence that

Stillaguamish had fished in marine waters beyond the river system at and before treaty times.

To ensure implementation of the judgment announced in the case, Judge Boldt issued a permanent injunction against the State. *Id.* at 413–20. In Paragraph 25(a)(6)[1] of the injunction, Judge Boldt authorized the party tribes to "invoke the continuing jurisdiction of this court" to determine "the location of any of a tribe's usual and accustomed fishing grounds not specifically determined by Final Decision #1." *Id.* at 419. Approximately eighty sub-proceedings have been brought under the injunction in the decades since. *See Opinions in United States v. Washington*, Gallagher Law Library University of Washington School of Law (last updated Mar. 20, 2024), https://tinyurl.com/ywe3jsrz.

In the years following Judge Boldt's initial ruling on its U&As, Stillaguamish sought to contest the limitation of its fishing to the river area by issuing internal regulations, which purported to allow its members to fish in marine waters. *United States v. Washington*, 459 F. Supp. 1020, 1068 (W.D. Wash. 1978), *aff'd*, 645 F.2d 749 (9th Cir. 1981). Judge Boldt upbraided the Tribe in a subsequent sub-proceeding for attempting to "unilaterally[] expand[] its fishing places beyond those areas recognized and determined in Final Decision #1." *Id.* If Stillaguamish intended to establish its right to fish in marine waters—a prerogative that Judge Boldt stated was not foreclosed by the 1974 U&As determination—it would have to do so by

---

[1] As originally published, this provision of the injunction was numbered as Paragraph 25(f), but a subsequent order modified the paragraph, renumbering its provisions. *See United States v. Washington*, 18 F. Supp. 3d 1172, 1213 (W.D. Wash. 1991).

following the procedures set forth in Paragraph 25 of the
initial injunction. *Id.* ("The Stillaguamish Tribe may at any
future time apply to this court for hearing . . . regarding
expanded usual and accustomed fishing places so long as
such application is in accordance with paragraph 25 of the
court's injunction.").

Since then, Stillaguamish has asserted its right to fish
certain marine waters in various sub-proceedings, although
its claims have never been decided on the merits. Its first
attempt was dismissed without prejudice. The Tribe later
intervened in a sub-proceeding initiated by the Tulalip Tribe
and asserted its fishing rights against the Tulalip's claim of
exclusive fishing rights in the northern portion of Port Susan.
The tribes came to an agreement that ended that sub-
proceeding without judicial resolution. Stillaguamish
opened another sub-proceeding to expand its U&As in 1993,
but it later moved to voluntarily dismiss the sub-proceeding
for financial inability to pursue its claims at that time. The
original specification of the Stillaguamish U&As announced
by Judge Boldt thus remained in force at the outset of the
present litigation.

That brings us to the current sub-proceeding. In
September 2017, after fulfilling pre-filing requirements,
Stillaguamish filed a request for determination with the
District Court for the Western District of Washington.
*Stillaguamish Tribe of Indians v. Washington*, Case No. 17-
sp-3 (W.D. Wash. Dec. 30, 2022), Dkt. No. 4. The district
court opened Sub-proceeding 17-3 as Paragraph 25 requires
and notified the other tribes. Sixteen tribes either intervened
or elected to participate as interested parties. Stillaguamish
asserted that its usual and accustomed fishing grounds
extended far beyond the Stillaguamish River and included
many marine waters to the east of Whidbey Island. The

Tribe argued that its U&As included Port Susan, Skagit Bay, Saratoga Passage, Penn Cove, Holmes Harbor, and Deception Pass.

At an eight-day bench trial that began in March 2022, Stillaguamish presented documentary evidence and expert testimony about the historical locations and activities of the Stillaguamish Tribe. The Tribe relied heavily on the expert testimony of Dr. Chris Friday, a historian who offered his opinions about the likely fishing habits of the Stillaguamish people based on historical evidence primarily drawn from prior anthropologists and historians who had studied the Stillaguamish village locations, intermarriage practices, and travel. After Stillaguamish had concluded its case-in-chief, intervenor Upper Skagit Indian Tribe moved under Federal Rule of Civil Procedure 52(c) for judgment against Stillaguamish on partial findings. The district court deferred ruling on the motion, as permitted by Rule 52, and heard evidence from the other participating tribes.

After considering this evidence and supplemental briefing, the district court granted Upper Skagit's Rule 52(c) motion on December 30, 2022. The court generally characterized the historical evidence as "scant." "[A]lthough there is ample evidence that the Stillaguamish were a river fishing people during treaty times," the court said, "the evidence is insufficient to demonstrate by a preponderance of the evidence that they fished 'customarily . . . from time to time' in saltwater, or that the marine areas at issue were their 'usual and accustomed' grounds and stations." The court also noted that the standard for establishing U&As under *Final Decision #1* required that the Tribe demonstrate that it fished the claimed waters before *and* at treaty time. It concluded that Dr. Friday's testimony was too speculative to meet that standard; it lacked "any

direct evidence, indirect evidence, nor any reasonable inference of marine fishing activity by the Stillaguamish *at treaty time*." Accordingly, the court granted Upper Skagit's motion and entered judgment on partial findings against Stillaguamish.

Stillaguamish timely appealed the order.

## II.  DISCUSSION

Stillaguamish raises three issues on appeal.  First, did the district court properly apply Judge Boldt's original decision in *United States v. Washington*?  Second, were the district court's findings clearly erroneous?  Third, did the district court err in concluding Stillaguamish did not establish that the disputed areas were their usual and accustomed fishing grounds at and before 1855 when the Treaty of Point Elliott was signed?  We conclude that the district court applied the proper law of the case, but we cannot determine the second and third issues because the district court's findings are inadequate.  We remand for further proceedings.

## A.  *The District Court Correctly Applied the Law of the Case*

Stillaguamish makes several challenges to the district court's application of the law of the case as set forth in *Final Decision #1* and its various sub-proceedings.  First, it contends that we cannot be sure the district court even applied the standard set forth in *Final Decision #1* for determining a tribe's U&As because the court did not cite that decision.  The court, however, quoted the relevant language on U&As nearly verbatim, inquiring into where the Tribe "customarily fished" "at and before treaty times." *Cf. Final Decision #1*, 384 F. Supp. at 332.  Moreover, the district court has handled numerous proceedings brought under Paragraph 25.  We therefore do not doubt that the

district court was very familiar with and applied the U&As test set forth in *Final Decision #1*.

The Tribe also contends that the district court misapprehended the law of the case.  Its objections are threefold: (1) the court failed to draw the requisite inferences of fishing from evidence of village location, travel, and tribal presence; (2) it did not apply the "relaxed" preponderance standard that applies to U&As determinations;  and  (3) it  erroneously  demanded  non-speculative evidence of the Tribe's fishing at treaty time.

None of these arguments persuade us.  Although the district court has previously inferred fishing from evidence of villages, travel, and presence, such evidence has never been treated as determinative of U&As in the face of contradictory evidence.  *See*, *e.g.*, *United States v. Washington*, 129 F. Supp. 3d 1069, 1110 (W.D. Wash. 2015), *aff'd sub nom. Makah Indian Tribe v. Quileute Indian Tribe*, 873 F.3d 1157 (9th Cir. 2017).  Inferences made by the district court in past sub-proceedings do not necessarily bind the court to come to the same legal conclusions in others where the evidence is more equivocal.  We cannot perceive any misapplication of the law of the case in the district court's failure to draw certain inferences.

Nor did the court apply an erroneous standard of proof. The court repeatedly noted that the Tribe had to establish U&As by a preponderance of the evidence as *Final Decision #1* dictated.  *See Final Decision #1*, 384 F. Supp. at 348.  The court also accounted for the less stringent standard applied in this case by citing the relevance of "reasonable inferences" that can be drawn from the fragmentary historical record.  *See Washington*, 129 F. Supp. 3d at 1110. Finally, the district court's requirement of evidence of

fishing *at treaty time* is perfectly consistent with *Final Decision #1* which mandates proof of fishing "at *and* before treaty times." 384 F. Supp. at 332 (emphasis added).

We conclude that the district court correctly applied the controlling law of *United States v. Washington*.

B. *The District Court Did Not Make Sufficient Factual Findings to Enable Our Review*

Correct application of the law notwithstanding, we cannot affirm the district court's factual findings or conclusions of law on the threadbare state of the order before us. For purposes of appellate review, the district court's factual findings "should be explicit enough to give the appellate court a clear understanding of the basis of the trial court's decision." *Alpha Distrib. Co. of Cal. v. Jack Daniel Distillery*, 454 F.2d 442, 453 (9th Cir. 1972). We therefore affirm judgment on partial findings only if "the findings are sufficiently comprehensive and pertinent to the issues to provide a basis for the decision, or if there can be no genuine dispute about omitted findings." *Vance v. Am. Hawaii Cruises, Inc.*, 789 F.2d 790, 792 (9th Cir. 1986) (citation omitted).

In its case-in-chief, Stillaguamish set forth considerable evidence bearing on the Tribe's history of fishing in the Claimed Waters. Most of the Stillaguamish evidence was presented through the testimony and exhibits of a historian, Dr. Chris Friday, who largely synthesized evidence presented in prior public proceedings. For example, Dr. Friday cited the work of anthropologist Dr. Carroll Riley, who stated in a 1956 proceeding that Stillaguamish "came down to Port Susan and lower Skagit Bay for clamming and fishing" at and before treaty time. Dr. Riley also noted that Stillaguamish likely used areas adjacent to the Claimed

Waters such as Warm Beach by Port Susan and Camano Island between Port Susan and Saratoga Passage. Nor was Dr. Riley the only one to draw such conclusions. Dr. Friday referred to multiple references from tribal elders, anthropologists, and historians to Stillaguamish's presence and villages on the coasts of Port Susan, Skagit Bay, and Saratoga Passage. Of significant note were the opinions of Dr. Barbara Lane, an anthropologist whose research Judge Boldt treated as definitive in *Final Decision #1*. Dr. Friday quoted Dr. Lane, who testified in a proceeding in 1984 that she believed that Stillaguamish had villages by Port Susan, and opined in a private letter in 1974 that "it is inconceivable that" the inhabitants of those villages "would not have fished [the adjacent] waters."

We understand the district court's frustration with a proceeding that reviews evidence already presented in proceedings held anywhere from forty to ninety years ago— proceedings that themselves collected data relating to events that must date to 1855 and earlier. We further recognize that the district court has substantial knowledge and expertise concerning this case that cannot be fully reflected in any single order it issues. The district court has admirably overseen these sub-proceedings, which we appreciate require considerable judicial resources.

At the same time, the district court's findings must be sufficiently comprehensive to permit our meaningful appellate review. *See Alpha Distrib. Co. of Cal.*, 454 F.2d at 453. The district court's task in this sub-proceeding was to evaluate all the Tribe's evidence—whether it had previously been considered in other contexts or not—as it bears on the question of Stillaguamish's U&As. As it is, we are left wondering what the district court made of the extensive evidence before it. It may be that the court discredited some

of the expert historical analysis because it was controverted by other historians. It may be that the court discounted evidence of Stillaguamish's presence in certain areas due to conflicting historical data. Whatever its reasons, the court's order informs us only that it concluded "the evidence is insufficient to demonstrate by a preponderance of the evidence that [Stillaguamish] fished 'customarily . . . from time to time' in saltwater, or that the marine areas at issue were their 'usual and accustomed' grounds and stations." Without further insight into what facts the district court took as established and what evidence it rejected, we cannot tell whether that conclusion is correct as a matter of law.

We therefore vacate the order of the district court and remand for further factual findings as to the Tribe's evidence of villages, presence, and fishing activities in the Claimed Waters.

**VACATED AND REMANDED.**

---

BRESS, Circuit Judge, with whom BYBEE, Circuit Judge, joins, concurring:

Fifty years ago, the Honorable George Boldt of the United States District Court for the Western District of Washington issued a historic decision protecting the treaty rights of Indian tribes in Washington to fish in their usual and accustomed fishing grounds. *United States v. Washington*, 384 F. Supp. 312 (W.D. Wash. 1974) (*Final Decision #1*). This was a pathbreaking ruling. It righted longstanding wrongs committed against the tribes. And it halted illegal state encroachment of tribal fishing rights, ensuring that tribes would be able to take fish as promised to

their forebears in exchange for the transfer of lands to the United States in the 1850s. In connection with his decision, Judge Boldt issued an injunction against the State of Washington to protect the tribes.

As part of that injunction, Judge Boldt provided for the district court's continuing jurisdiction to enforce his decree. His order allowed for broad continuing jurisdiction, including over "the location of any of a tribe's usual and accustomed fishing grounds not specifically determined by Final Decision #1." *Id.* at 419. This has led to a series of highly complicated "sub-proceedings" like this one, in which tribes spar over the historical lines governing which tribes get to fish where in Puget Sound and surrounding waters. As one of the tribes has told us here, "[w]hile this case was originally meant to resolve more than a century of frequent and often violent controversy between Indians and non-Indians over treaty right fishing, under the Permanent Injunction, the litigation has evolved and now continues to thrive as a means for resolving inter-tribal fishing disputes."

Over the years, however, some judges on our court have questioned whether it is still appropriate for a federal district court to exercise continuing jurisdiction over a 1974 decree whose original basis, it appears, has now long run its course. I share that concern. And the concern is not a light one, going to the very power of the federal courts. But change does not come easy, especially when the Indian tribes in Washington State have built up an understandable reliance on the 1974 decree as a mechanism for resolving disputes among themselves.

In this concurrence, I suggest a path forward for assessing the continued necessity and scope of the Boldt injunction, one that involves full due process to all interested

parties. The district court could adopt this approach. Any party could request it. Or, better yet, the parties could work collaboratively to fashion a process for reviewing the Boldt decree, consistent with the Supreme Court's clear pronouncements that perpetual judicial superintendence through injunction raises serious questions about the lawful exercise of judicial power.

We do not order that any changes to the Boldt decree be made today. Given the findings of fact and conclusions of law that are needed, it is most preferable, in this long-running and complex matter, that any change take place through a deliberative process that begins in the district court. But a fifty-year injunction is no normal thing. And if proceedings are not undertaken soon to evaluate the injunction's proper scope and continued necessity, this court in a future case could consider directing the form of proceedings that I lay out here.

I

The Treaty of Point Elliott of 1855 and other treaties from around this time gave signatory tribes in Washington fishing rights at their "usual and accustomed grounds and stations." *United States v. Washington*, 928 F.3d 783, 785 (9th Cir. 2019). After years of state and commercial interference with tribal fishing—in which "the state of Washington enacted legislation and enforced fishing regulations in a manner detrimental to the tribes' fishing rights"—the United States in 1970 sued the state to enforce the tribes' rights under the treaties. *Id.* at 786. After presiding over complex litigation for more than three years, Judge Boldt issued *Final Decision #1* in 1974. 384 F. Supp. at 328. Judge Boldt's decision significantly altered the on-the-ground reality of fishing in western Washington—both

for the tribes and for the commercial fishing operations that were operating in the tribes' customary grounds.

Judge Boldt was conscious of the fact that *Final Decision #1* "could not resolve every future dispute over tribal fishing rights." *Upper Skagit Indian Tribe v. Sauk-Suiattle Indian Tribe*, 66 F.4th 766, 768 (9th Cir. 2023). *Final Decision #1* thus found that "continuing jurisdiction would be of great value to all parties in promptly putting the court's rulings into effect." 384 F. Supp. at 347. Accordingly, Judge Boldt "reserve[d] continuing jurisdiction of this case without limitation at this time." *Id.*

Paragraph 25 of the injunction addresses the court's continuing jurisdiction. *Id.* at 419. Among other things, "[t]he parties or any of them may invoke the continuing jurisdiction of this court in order to determine": (1) "whether or not the actions, intended or effected by any party . . . are in conformity with [*Final Decision #1*] or this injunction"; (2) "disputes concerning the subject matter of this case which the parties have been unable to resolve among themselves"; (3) "the location of any of a tribe's usual and accustomed fishing grounds not specifically determined by [*Final Decision #1*]"; and (4) "such other matters as the court may deem appropriate." *Id.*

Over the ensuing decades, Paragraph 25 has been the basis for extensive sub-proceedings in the *United States v. Washington* legal universe. *Swinomish Indian Tribal Cmty. v. Lummi Nation*, 80 F.4th 1056, 1063 (9th Cir. 2023), *as amended* ("In the nearly 50 years since Judge Boldt's 1974 decree, the Indian tribes of Washington State have often invoked the district court's continuing jurisdiction under Paragraph 25 to settle overlapping tribal claims to historical fishing waters."). This includes sub-proceedings like the one

here, in which the tribes seek to demarcate the boundaries of a tribe's usual and accustomed fishing grounds. *See, e.g.*, *id.* at 1059; *Tulalip Tribes v. Suquamish Indian Tribe*, 794 F.3d 1129, 1130 (9th Cir. 2015); *Upper Skagit Indian Tribe v. Washington*, 590 F.3d 1020, 1022–23 (9th Cir. 2010), *as amended*. These types of sub-proceedings can be brought by a tribe hoping to gain court recognition of a right to fish in new areas, like the Stillaguamish here, or by other tribes who seek a ruling that a tribe's fishing rights do not extend to certain waters. *See Swinomish Indian Tribal Cmty.*, 80 F.4th at 1059 ("This proceeding was instituted by three Indian tribes who sought a ruling that the recognized fishing rights of the Lummi Nation . . . under the 1974 decree do not extend to certain areas.").

This litigation has proven both enduring and extremely complicated. As we summarized the situation some years ago, "we cannot think of a more comprehensive and complex case than this." *Upper Skagit Indian Tribe*, 590 F.3d at 1022 (quoting *United States v. Suquamish Indian Tribe*, 901 F.2d 772, 775 (9th Cir. 1990)) (alteration omitted). The *United States v. Washington* sub-proceedings require a significant investment of judicial resources because they involve examination (or re-examination) of very dated materials with the goal of implementing a now very old decree. We have held that we must interpret the 1974 decree "consistent with Judge Boldt's intent." *Upper Skagit Indian Tribe*, 66 F.4th at 770. This is complicated by the fact that Judge Boldt passed away many decades ago. To effectuate Judge Boldt's intent, courts must now sift through sometimes centuries-old evidence of historical tribal fishing practices, much of which has been the subject of prior litigation over the preceding years.

In this case alone, the record includes thousands of pages of historical and anthropological evidence, including nineteenth century maps, handwritten notes describing tribal boundaries, records from Indian Claims Commission proceedings, testimony of tribal elders, and decades-old news clippings.  Some of these documents are barely legible. Due to the limited nature of the historical record and the constantly evolving disputes that we confront, it is necessary to bring all this evidence to bear when making legal decisions about historic fishing practices on a set of adjoining waterways, bays, and beaches.  This task is further complicated by the fact that key expert witnesses, such as Dr. Barbara Lane, have died since *Final Decision #1* was issued.  As today's per curiam opinion explains, some of the expert testimony in present sub-proceedings consists of experts reviewing the expert reports produced in the original 1970 litigation to draw their own conclusions.

Judges on our court have, at times, expressed concern with the difficulty of resolving these cases so long after the events in question.  In 2009, one panel lamented:

> We pretend to be able to read the mind of the long deceased district judge who initially issued the decree on matters of which he did not speak.  And we pretend to determine what the Indian tribes did 150 years ago at a time for which there is no evidence of especially high reliability and little evidence of any kind.  This exercise is not law, and is not a reliable way to find facts . . . .

*United States v. Washington*, 573 F.3d 701, 710 (9th Cir. 2009); *see also Swinomish Indian Tribal Cmty.*, 80 F.4th at

1063 ("The task of interpreting the occasionally cryptic terms of a decades-old decree, itself based on a sometimes thin record of anthropological evidence regarding the practices of Indian tribes more than a century earlier, has not always proved to be an easy one."); *Upper Skagit Indian Tribe*, 590 F.3d at 1026 (Kleinfeld, J., dissenting) (describing the sub-proceedings as "extremely burdensome and expensive" and "a fundamentally futile undertaking").

Although evidentiary difficulties could not override our duty to decide disputes properly before us, we have also questioned whether these sub-proceedings remain legally permissible. Writing in 2009, we queried "why the equitable decree in this case remains in force at all." *Washington*, 573 F.3d at 709. "The point of the lawsuit the United States filed" in 1970, we explained, "was to protect Indian treaty rights from state infringement, not to sort out competing tribal claims." *Id.* But "[t]hat goal was achieved, and has nothing to do with the continuing exercise of jurisdiction as far as we can tell from the record." *Id.*; *see also id.* at 710 ("No one alleges that the State of Washington's violations of the Indian tribes' treaty rights continue."). Citing the Supreme Court's directives on the limits of institutional reform injunctions, we questioned whether the 1974 decree remained a proper exercise of judicial power. *Id.* at 709–10. But because no party had asked us to modify or dissolve the injunction, we refrained from doing so, while noting that the parties could raise the issue in the future and that the district court could consider the matter sua sponte. *Id.* at 711.

Since the beginning of the *United States v. Washington* litigation, judges of the Western District of Washington have decided numerous matters arising from the 1974 Boldt decree. Like the district court in this case, these dedicated judges have displayed laudable diligence in working through

the unusually difficult issues that sub-proceedings like this
one present.  We owe deep respect and gratitude to these
judges for their work.  At times they too have questioned the
continued appropriateness of these sub-proceedings.  But
notwithstanding these hesitations, they have pressed on with
the important work of this challenging case.  Even so, calls
for revisiting the 1974 decree have persisted.  *See, e.g.*,
*Washington*, 928 F.3d at 792–93 (Bea, J., concurring)
("[W]e should reevaluate Judge Boldt's equitable decree
soon. . . .  At some point, this court should consider whether
[the decree's] objective has been met."); *Upper Skagit
Indian Tribe*, 590 F.3d at 1026 (Kleinfeld, J., dissenting)
("Judge Boldt's 1974 decree and its implementation process,
continuing this case in perpetuity, should be brought to an
end.").

## II

The questions that have been raised about the continued
scope and necessity of the Boldt injunction are legitimate.
In my view, the Boldt decree's continued perseverance
presents serious questions about the limits of our authority.

When a district court retains jurisdiction over future
proceedings following its issuance of an injunction, its
continuing jurisdiction derives from its equitable power.  *See
Sandpiper Vill. Condo. Ass'n, Inc. v. Louisiana-Pac. Corp.*,
428 F.3d 831, 841 (9th Cir. 2005) (explaining that the
retention of continuing jurisdiction provides a "requisite
independent basis" for the court's jurisdiction in subsequent
proceedings).  The basis for jurisdiction in the continued
*United States v. Washington* sub-proceedings is not the
treaties that provided the jurisdictional hook for the original
dispute.  *See Washington*, 573 F.3d at 703, 707 (explaining
that the "treaties were between the tribes and the United

States, and did not purport to settle disputes between different tribes," meaning that, in sub-proceedings, "[t]here is no treaty and no agreement of any kind between the tribes to be construed and applied"). Instead, and contrary to the suggestion in Judge Gould's concurrence, the district court's jurisdiction over a case like this derives from Paragraph 25 of the 1974 injunction. *See Washington*, 928 F.3d at 786–87 (explaining the process for invoking continuing jurisdiction in *United States v. Washington* cases); *Upper Skagit Indian Tribe*, 66 F.4th at 768–69 (describing how Paragraph 25 supplies the jurisdictional basis for a sub-proceeding involving disputes over tribal fishing grounds).

The court's continuing jurisdiction thus rises and falls with the continued propriety of Judge Boldt's underlying equitable decree. And it follows that if the exercise of that equitable power is no longer proper, the court's continuing jurisdiction terminates. The ongoing scope and necessity of the Boldt injunction thus implicate the court's obligation to assure itself of its power to act. *See Sinochem Int'l. Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007) (citing *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 93–102 (1998)).

The 1974 Boldt decree effectively places management of the Puget Sound fishery in the hands of a federal district court. *See Washington*, 573 F.3d at 709. This general concept was "deplore[d]" by some during *Final Decision #1*'s appeal, and only accepted at that time because of the "recalcitrance of Washington State officials (and their vocal non-Indian commercial and sports fishing allies) which produced the denial of Indian rights requiring intervention by the district court." *United States v. Washington*, 520 F.2d 676, 693 (9th Cir. 1975) (Burns, J., concurring). But absent indication of continued state encroachment on tribal rights,

we cannot assume that such an injunction remains forever justified.

The Supreme Court has stressed that a court that fashions an institutional injunction "has the continuing duty and responsibility to assess the efficacy and consequences of its order." *Brown v. Plata*, 563 U.S. 493, 542 (2011). "If a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper." *Horne v. Flores*, 557 U.S. 433, 450 (2009). Large-scale injunctions, in particular, require regular reassessment. As the Supreme Court has directed, "sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen." *Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 647 (1961). Quite clearly, the circumstances prompting the original Boldt decree have changed since 1974. Those changes require consideration of the continued necessity and scope of the 1974 injunction, and thus the court's continuing jurisdiction.

The exercise of continuing jurisdiction in this case has consequences, as well, for the balance of power among other constitutional actors. The overextension of judicial power impedes the authority of those who may lay a greater claim to it in our constitutional structure. Here that includes federal agencies, the State of Washington, tribal courts, and perhaps others, all of whom, absent the injunction, may have a meaningful role to play in managing fishing and tribal relations in this area of the country. *See Washington*, 573 F.3d at 708–09. The continuation of the Boldt decree thus not only raises questions of judicial competence and authority, but vital concerns about federalism and the separation of powers.

### III

I now turn to how these important issues might be considered.  Previous calls for reevaluating the Boldt decree have not led to any serious action.  The reason, I suspect, is that the Boldt decree has now been in place for so long that, for those whose interests are affected, it can be difficult to imagine a world without it or a way in which it might be pared down.  But if change is needed, as I suspect the law may require, it must take place through a robust process that respects the interests at stake.

These issues are of paramount importance to the tribes.  We cannot undervalue this.  The tribes understandably maintain that the 1974 decree and the regime of sub-proceedings that it created remain critical for protecting tribal rights.  When asked at oral argument, "Is there any point at which this injunction, this decree, needs to be concluded?," counsel for one tribe responded: "There is absolutely no point in time, Your Honor."  That position is perhaps expected.  But it is in clear tension with the Supreme Court's prescriptions on equitable decrees and the limits on judicial power.[1]

In the interest of fairness to all involved, most especially the tribes, I believe we must have a complete accounting of the continued need and proper scope of the Boldt decree.  That would require full evidentiary proceedings in the district court, in which all interested parties—the tribes, governmental entities, environmental groups, industry

---

[1] A similar point can be said of Judge Gould's separate concurrence.  That concurrence's apparent suggestion that an injunction does not merit any peeking under the hood even fifty years later does not account for the Supreme Court's directives on large-scale injunctions and the evolution of this litigation over the last several decades.

representatives, experts, and others—could offer evidence and argument.  The district court could broadly invite the views of all persons who have a stake in Judge Boldt's historic decree.  At the conclusion of those evidentiary proceedings, the district court could then issue findings of fact and conclusions of law on the decree's continued necessity and scope.

*Final Decision #1* encompasses a broad set of issues, and it may be that the district court could conclude that some parts of the decree should be vacated while other portions of it should remain in place.  If the district court concludes that any injunction remains necessary, it should issue a revised injunction.  The district court's decision could then be reviewed on appeal, whether through any challenges made directly or in any future sub-proceeding.

I recognize that what I am contemplating would require considerable judicial and litigation resources.  But we face that prospect already if we continue indefinitely with the arduous sub-proceedings that have characterized the last several decades of this litigation.  And it should hardly be surprising that proceedings aimed at reevaluating the Boldt decree would bear a complexity reminiscent of the litigation as a whole.

Our court could order the proceedings I have set forth, and with the parties now on notice of the possibility, perhaps in a future case it will.  But it would be preferable if this process originated in the court that enacted this injunction fifty years ago.  The district court and the parties are best situated to determine the contours of the proceedings necessary for reevaluating the Boldt decree.  The tribes, who maintain that the Boldt decree remains critically necessary, may have particular views on how the proceedings should

take place—views that should be fully taken into consideration.

For my part, I question how, a half-century later, the Boldt decree remains appropriate in its present form.  There are valid questions as to whether it remains appropriate at all.  But what is needed first is a sound process for examining these questions.  A complete record on these issues is the next step in complying with the Supreme Court's directions on the limits of injunctive decrees.  It is my sincere hope that before any court orders it, the parties to these sub-proceedings can take the lead in fashioning a proposal for the district court to consider.

---

GOULD, Circuit Judge, concurring:

I do not share any concern about our jurisdiction to hear this case.  The Stillaguamish Tribe of Indians holds *bona fide* fishing rights pursuant to the United States' treaty with the Tribe.  We have jurisdiction to consider the scope of those fishing rights.  Congress directed that federal district courts are the proper fora for suits arising under the treaties of the United States, especially those suits brought by federally recognized Indian tribes.    28 U.S.C.  §§ 1331, 1362.  Paragraph 25 of the Boldt decision does not create jurisdiction out of thin air—it relies on the original jurisdiction that federal courts maintain to adjudicate tribes' treaty rights.  Even if Judge Bress's citations to Supreme Court precedent were to raise doubts about our jurisdiction, the Supreme Court has declined the opportunity to reevaluate the Boldt framework as recently as 2018. *Washington v. United States*, 584 U.S. 837 (2018).

The Boldt decision has aided our consideration of many controversies regarding a critical resource in this region—fish—that must be shared and protected among various stakeholders, including tribes, the federal government, the state government, and industry actors.  *See, e.g.*, *United States v. Washington*, 853 F.3d 946 (9th Cir. 2017).  Tribes—who have fished on and near the Salish Sea for ages and who reserved their fishing rights during treaty-making—are the senior rights holders in this context.

The points made by Judge Bress in favor of a reexamination of the Boldt decision are interesting, but they are largely strangers to the controversy in this case.  They command no authority.